Mildred **ANDERSON**, Wife of/and Harry Britain, Individually and as Administrators of the Estate of Helen Anita Britain, Plaintiffs,

v.

**SEARS, ROEBUCK & COMPANY et al.,**
Defendants.

Civ. A. No. 70–1915.

United States District Court,
E. D. Louisiana.

May 6, 1974.

Frederick J. Gisevius, Jr., Aubrey E. Pate, New Orleans, La., for plaintiffs.

Chester Francipane, Metairie, La., Favret & Favret, New Orleans, La., for Sears, Roebuck & Co.

Wood Brown, III, Montgomery, Barnett, Brown & Read, New Orleans, La., for Employers Mut. of Wausau and Preway, Inc.

Francis G. Weller, Deutsch, Kerrigan & Stiles, New Orleans, La., for Controls Co. of America and Employers Liability Assurance Corp., Ltd.

## MEMORANDUM AND ORDER

CASSIBRY, District Judge:

On April 23, 1970 the Britains' home was completely consumed by a fire which was ignited by a defective Sears' heater. Both Mildred Britain and her infant daughter, Helen Britain, were severely burned and Helen Britain suffered multiple permanent injuries. Thereafter, Mildred Britain and Harry Britain, individually and as administrator of the estate of Helen Britain, brought suit against Sears, Roebuck and Company, Preway, Inc., and Employers Mutual Liability Insurance Company of Wisconsin. Preway, Inc. and its insurer, Employers Mutual Liability Insurance Company of Wisconsin, third-partied Employers Liability Assurance Corporation, Ltd., the insurer of Controls Company of America, and plaintiffs then amended their complaint to add Employers Liability Assurance Corporation, Ltd. as an additional defendant. Plaintiffs ground their quest for recovery on two distinct theories. They allege that Sears was negligent in the installation, maintenance, and repair of the heater, and that Sears, Preway, and Employers Liability Assurance Corporation, the insurer of Controls Company of America, are liable as the manufacturers of the heater and its component parts.

The case was fairly and properly tried, over a period of eight days, before a competent and attentive jury. After having received comprehensive and impartial charges, the jury deliberated a reasonable length of time and returned a verdict in favor of Mildred Britain, Harry Britain, individually, and Harry Britain, as administrator of the estate of Helen Britain, and against

Sears, Preway and Preway's insurer, Employers Mutual of Wausau, for two hundred fifty thousand dollars, twenty three thousand dollars, and two million dollars respectively. The defendant, Employers Liability Assurance Corporation, the insurer of Controls Corporation of America, received a favorable verdict.

The cast defendants have moved for post-trial relief via motions for a judgment notwithstanding the verdict, a new trial, and/or alternatively, a remittitur. All of these motions save one have been disposed of. The sole issue presently before the court is whether the damages awarded to Helen Britain were excessive.

Although the case defendants contend that the damages awarded to Helen Britain were excessive, none of them have referred me to any evidence which infers or establishes that the award was excessive, nor have they been able to establish that passion, prejudice or any other improper motive influenced the jury in making its award. Defendants ground their argument of excessiveness merely on the size of the verdict. The reasonableness of quantum, however, is not to be decided in a vacuum but rather is to be considered in light of the evidence as to the injuries and actual damages sustained and the future effects thereof. In this context, defendants have not offered any evidence at trial nor have they directed any cogent arguments in their briefs to sustain their burden of proving that the verdict was excessive.

■ The legal standard on which to gauge a jury verdict for remittitur purposes is the "maximum recovery rule," Gorsalitz v. Olin Mathieson Chemical Corp., 429 F.2d 1033 (5th Cir. 1970); Glazer v. Glazer, 278 F.Supp. 476 (E.D. La.1968). This rule directs the trial judge to determine whether the verdict of the jury exceeds the maximum amount which the jury could reasonably find and if it does, the trial judge may then reduce the verdict to the highest amount that the jury could properly have awarded. Functionally, the maxi-

mum recovery rule both preserves the constitutionally protected role of the jury as finder of facts and prevents the predilections of the judge from infecting the jury's determination. Thus, the court's task is to ascertain, by scrutinizing all of the evidence as to each element of damages, what amount would be the maximum the jury could have reasonably awarded. In this case there are five cardinal elements of damages: past physical and mental pain; future physical and mental pain; future medical expenses; loss of earning capacity and permanent disability and disfigurement.

## PAST PHYSICAL AND MENTAL PAIN

■ The infant child Helen Britain, was almost burned to death in the tragic fire that swept her home. She was burned over forty per cent of her entire body; third degree burns cover eighty per cent of her scalp and second and third degree burns of the trunk and of her extremities account for the remainder. Helen Britain's immediate post-trauma treatment required hospitalization for twenty-eight days, during which time the child developed pneumonia, required numerous transfusions, suffered fever, vomiting, diarrhea, and infection, and underwent skin graft surgery, under general anesthesia, to her scalp, which was only partially successful. Keloid scarring caused webbing and ankylosis of the child's extremities and severely limited their motion. The child's fingers became adhered together; scarring bent the arm at the elbow in a burdensome, fixed position; and thick scarring on the thighs and on the side of and behind the knees impaired walking.

This child had to undergo subsequent hospitalizations for further major operations and treatment. The second major operation under general anesthesia was undertaken to graft new skin from the back and stomach to the remaining bare areas of the scalp. The third operation under general anesthesia was an attempt to relieve the deformity of her left hand caused by the webbing scars which

bound down the fingers of that hand. A fourth operation under general anesthesia was performed to reduce scars which had grown back on the left hand again webbing the fingers. I cannot envisage the breadth and intensity of the pain experienced by Helen Britain throughout this ordeal.

The undisputed testimony reveals that one of the most tragic aspects of this case is that the horrible mental and emotional trauma caused to this child occurred at an age which medical experts maintain is crucial to a child's entire psyche and personality formation. Helen Britain's persistent emotional and mental disturbance is evidenced by bed wetting, nightmares, refusing to sleep alone, withdrawal, and speech impediments. Dr. Cyril Phillips, a psychiatrist, and Dr. Diamond both indicated that the child manifested to them, even at this early age, emotional illness and retarded mental growth.

The evidence reflects that an award of six hundred thousand dollars for this element of damages alone would not be unreasonable.

## FUTURE PHYSICAL AND MENTAL PAIN

██ There is clear evidence that the stretching, pulling, and breaking down of scars inherent in growth will continue to cause severe pain and a crippling limitation of motion in varying degrees to all of Helen Britain's upper and lower extremities. Very little can be done to improve the condition of the scalp which will never be able to breathe, sweat or grow hair. There will be risks, trauma and pain, both physical and mental, with each of the recommended twenty-seven future operations which will extend over most of the child's adult life, if she is in fact fortunate enough to be able to risk undergoing these recommended surgeries. Furthermore, Helen Britain must vigilantly guard against irritation, infection and further injury to the damaged and abnormal skin, scars and grafts because any injury, however

slight, can generate cancer in these adynamic areas.

The inherent stresses and tensions of each new phase of life will severely tax this little girl's debilitated and delicate mental and emotional capacity. Throughout her future life expectancy of seventy-five years, it is reasonable to expect, that she will be deprived of a normal social life and that she will never find a husband and raise a family. On top of this, Helen Britain will always be subjected to rejection, stares and tactless inquiries from children and adults.

The court concludes that an award of seven hundred fifty thousand dollars for this element of damages alone would not be excessive.

## FUTURE MEDICAL EXPENSES

██ A large award for future medical expenses is justified. The uncontradicted testimony was that Helen Britain would need the guidance, treatment and counselling of a team of doctors, including plastic surgeons, psychiatrists and sociologists, throughout her lifetime. Add to this the cost of the twenty-seven recommended operations and the cost of private tutoring necessitated by the child's mental and emotional needs and the jury could justifiably award a figure of two hundred and fifty thousand dollars to cover these future expenses.

## LOSS OF EARNING CAPACITY

██ The evidence of Helen Britain's disabilities both physical, mental and emotional was such that this court holds that the jury could properly find that these disabilities would prevent her from earning a living for the rest of her life. Not only do the physical impairments to her extremities disable her but her emotional limitations require avoiding stress and the combined effect is the permanent incapacity to maintain serious employment.

The jury was provided with actuarial figures which accurately calculated both the deduction of interest to be earned and the addition of an inflationary buff-

er, on any award made for future loss of earning capacity. In view of these incontrovertible projections at trial, it was within the province of the jury to award as much as $330,000.00 for the loss of earning capacity.

## PERMANENT DISABILITY AND DISFIGUREMENT

■ The award for this element of damage must evaluate in monetary terms the compensation due this plaintiff for the permanent physical, mental and emotional disabilities and disfigurements proved by the evidence adduced at trial. A narration treating Miss Britain's permanent disabilities and disfigurements would be lengthy and redundant; therefore, I resort to listing.

1. The complete permanent loss of 80% of the scalp caused by the destruction of sweat glands, hair follicles and tissue—all of which effects a grotesque disfigurement and freakish appearance.

2. The permanent loss of the normal use of the legs.

3. The permanent impairment of the left fingers and hand caused by recurring webbing and resulting in limited motion.

4. The permanent impairment of the right hand caused by scars and webbing of the fingers.

5. The permanent injury to the left elbow and left arm with ankylosis and resulting in a crippling deformity.

6. The permanent destruction of 40% of the normal skin. As a result of this a large portion of the body is covered by "pigskin." Pigskin resembles the dry, cracked skin of an aged person and is highly susceptible to irritation from such ordinary things as temperature changes and washing.

7. Permanent scars over the majority of the body where skin donor sites were removed,

8. The permanent impairment of speech.

9. The loss of three years of formative and impressionable childhood.

10. Permanently reduced and impaired emotional capacity.

11. The permanent impairment of normal social, recreational and educational life.

12. The permanent imprint of her mother's hand on her stomach.

Considering each of the foregoing items, the court concludes that the jury had the prerogative of awarding up to one million, one hundred thousand dollars for this element of damages.

By totaling the estimated maximum recovery for each element of damages, the jury's actual award is placed in proper perspective. According to my calculations the maximum jury award supported by the evidence in this case could have been two million, nine hundred eighty thousand dollars. Obviously, the jury's two million dollar verdict is well within the periphery established by the maximum award test.

■ The defendants assert three other grounds for a remittitur. They contend that there was error in the verdict since the verdict exceeded the amount prayed for in the plaintiff's pleadings. This contention fails because the plaintiffs' pleadings were amended subsequent to the jury verdict to conform to the evidence and the verdict of the jury. This amendment was permitted by the court in accordance with law. Stewart v. Banks, 397 F.2d 798 (5th Cir. 1968); Riggs, Ferris, and Geer v. Lillibridge, 316 F.2d 60 (2nd Cir. 1963); Wendy v. McLean Trucking Co., 279 F.2d 958 (2nd Cir. 1960); Fed.R.Civ.P. 54(c).

■ Preway and its insurer argue that the introduction of photographs of the plaintiff was inflammatory. Since a part of plaintiff's claim for damages is for disfigurement and the humiliation and embarrassment resulting therefrom, I·hold that these photographs were prop-

erly admitted to show the condition of the plaintiff as she appeared to others, at the time they were taken. Warrington v. Employers Group Insurance Companies, 207 So.2d 207 (La.App. 4th Cir. 1968); Presley v. Upper Mississippi Towing Corp., 153 So.2d 416 (La.App. 1st Cir. 1963); Bonner v. General Accident Fire & Life Assurance Corp., 136 So.2d 412 (La.App. 1st Cir. 1961), Fed. R.Civ.P. 43.

The defendants suggest that the presence of the child in the courtroom and in the corridors of the courthouse in some way inflamed or prejudiced the jury. This allegation is unfounded; the defendants have not pointed out any wrongful conduct on the part of Helen Britain, her parents, or counsel for plaintiffs. Helen Britain was well behaved and quiet the entire time she was in the courtroom.

Accordingly I hold that there was not any bias, prejudice, or any other improper influence which motivated the jury in making its award.

The defendants' motions for a remittitur are denied.