Ruby **CONWAY** et al.,
Plaintiffs-Appellees,

v.

**CHEMICAL LEAMAN TANK LINES,
INC.,** Defendant-Appellant.

No. 77-2533.

United States Court of Appeals,
Fifth Circuit.

Jan. 25, 1980.

Rehearing and Rehearing En Banc
Denied March 25, 1980.

Dale Dowell, Beaumont, Tex., for defendant-appellant.

Harold Peterson, Wendell C. Radford, Beaumont, Tex., for plaintiffs-appellees.

Before THORNBERRY, GEE, and HATCHETT, Circuit Judges.

PER CURIAM:

This appeal represents the second appearance of this case before our court,[1] and there have been three trials below—one of them unnecessary, as we here conclude. It is a death action having its genesis in the early morning hours of September 14, 1972, when two heavy tank trucks sideswiped each other near the centerline of an East Texas highway. One, that of Dixie Transport, lost its left front tire in the glancing impact and veered off the road to the left, overturning and killing its driver, appellees' decedent.

A jury trial in 1974 resulted in a judgment for plaintiffs-appellees and against the truck line operating the other vehicle. We reversed for reasons, not material here, given in the opinions noted above. A second trial in early 1977 produced a verdict in favor of defendant-appellant predicated on the jury's finding that both drivers were negligent in driving too close to the centerline. For reasons that we discuss more fully below, the trial judge set aside this verdict and ordered still another new trial. It is from the judgment for plaintiffs in this third trial that defendants bring error here, asserting error as well in the court's setting aside the verdict in the second trial and granting a third. Because we conclude that the third trial was erroneously granted, we need not examine the errors complained of in the conduct of that trial.

At the conclusion of the evidence in the second trial, the court prepared and gave the jury a somewhat unusual form of verdict that, with the answers returned by the jury, we reproduce below:

### VERDICT OF THE JURY

### INTERROGATORY NO. 1

Do you find from a preponderance of the evidence that the Defendant, Chemical Leaman Tank Lines, Inc., its agents, servants or employees, committed some act or omission of negligence which was a proximate cause of the injuries and death of the deceased, Robert Eugene Conway?

Answer: "Yes" or "No".

ANSWER: Yes.

---

1. Our opinion on the former appeal appears at 525 F.2d 927, and a supplemental one on rehearing at 540 F.2d 837.

If you have answered Interrogatory No. 1 "Yes" and only in that event, list below the acts or omissions of negligence you have so found.

We have decided the defendant was too close to center line, as was the plaintiff, causing the collision of mirrors, after which uncontrollable acts by both drivers caused the final collision.

### INTERROGATORY NO. 2

Do you find from a preponderance of the evidence that the deceased, Robert Eugene Conway, committed some act or omission of negligence which was a proximate cause of the injuries and death of the deceased?

Answer: "Yes" or "No".

ANSWER: Yes.

If you have answered Interrogatory No. 2 "Yes", and only in that event, list below the acts or omissions of negligence you have so found.

We have decided the plaintiff was also too close to the center line, causing the collision of mirrors, after which uncontrollable acts by both drivers caused the final collision.

Thereafter, on motion of plaintiffs, the judge set aside the above verdict and granted plaintiffs a new trial by an order reading in material part as follows:

On this 28th day of January, 1977, came on to be considered the Motion of Plaintiffs and Intervenors in the above-referenced case to set aside the verdict of the Jury and to grant a new trial, and the Court, having duly considered same and being fully advised, finds that, *under the law and the evidence, the answers of the jury to Special Interrogatories No. 1 and No. 2* returned on January 7, 1977, *do not support a verdict* (sic) *nor a judgment in favor of any party* to this cause. The Court further finds that such verdict should be set aside and a new trial should be had in this cause on all issues.

(emphasis added).

Appellant contends that the italicized language of the above order indicates it was entered on a manifestly erroneous legal basis. Appellant correctly notes that, read literally, the order refers to some deficiency in the form of the verdict itself, not to the sufficiency of the evidence to support the verdict. Clearly, however, the jury's answers to the interrogatories are a verdict and *do* support a judgment for the defendant. Its answers are neither inherently inconsistent nor conflicting; nor can there be doubt that in the circumstances presented— two heavy vehicles meeting on a darkened road—driving too close to the centerline can be an act of negligence, especially when each driver can see that the other is doing likewise. Thus, if this interpretation of the order were the only one available to us, we would be compelled to set the order aside and reinstate the jury verdict. The motion on which the court below acted urges evidentiary insufficiency, however, and the order itself does refer, in passing, to the evidence. We shall therefore proceed for purposes of argument on the assumption that the order was predicated at least in part on the ground that the verdict was unsupported by any of the evidence or was against its great weight. Since this assumption yields the same result as would a literal construction—that the trial judge erred in setting aside the verdict—no harm is done by our taking the only view of the order that does not render it clearly erroneous on its face.

### The Standard of Review

The general standard by which we review trial court orders granting new trials is abuse of discretion. *Spurlin v. General Motors Corp.,* 528 F.2d 612 (5th Cir. 1976). Such a standard recognizes the deference that is due the trial court's first-hand experience of the witnesses, their demeanor, the context of the trial, and the like. This deference is especially appropriate where a new trial is denied and the jury's determinations are left undisturbed. *Valley View Cattle Co. v. Iowa Beef Processors,* 548 F.2d 1219 (5th Cir. 1977). Recent cases in our circuit apply a somewhat broader review, however, to orders that *grant* new trials, mandating the great-

est degree of scrutiny where, as apparently here, a new trial is decreed on the ground that the verdict is against the weight of the evidence. *See, e. g., Love v. Sessions,* 568 F.2d 357 (5th Cir. 1978). We do so to assure that the judge does not simply substitute his judgment for that of the jury, thus depriving the litigants of their right to trial by jury. *Id.* at 361. In a further effort to avoid such substitutions, we have noted that new trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great—not merely the greater—weight of the evidence. *Spurlin v. General Motors Corp., supra* at 620. Factors militating against new trials in such cases are simplicity of the issues, the degree to which the evidence was in dispute, and the absence of any pernicious or undesirable occurrence at trial. *Ibid.* Bearing these considerations in mind, we return to the case at hand.

Here a new trial was granted, and the most favorable view of the order granting it is that the verdict of the jury was—in the judge's view—against the great weight of the evidence. The factual issue was simple: by whose negligence, if anyone's, did a truck collision come about? In certain critical respects, the evidence was highly conflicting, but in many other respects it was undisputed. The trial was decorous, devoid of any pernicious or undesirable occurrence. All recognized considerations, therefore, direct us toward the closest scrutiny of the evidence permissible in exercising our narrow power of review of the trial court's order.

### The Record Evidence

We begin by recounting that which is undisputed. The accident that resulted in Mr. Conway's death occurred in the dark of an early fall morning on U.S. Highway 90 near the small town of Devers, in East Texas. There U.S. 90 is a straight two-lane road, running east and west, with a center stripe and paved shoulders. Mr. Conway's truck was going west, that of the defendant east. Both vehicles were heavy, semi-trailer-type trucks, but Mr. Conway's was much the heavier, being loaded to a gross weight of about 40 tons, while defendant's was traveling empty at about 14 tons. Each truck was equipped with a "West Coast" rearview mirror protruding twelve to fourteen inches outward from the driver's side of the cab. The first impact between any portion of the vehicles was between these mirrors, glass from which was found on and around the highway's centerline. A second impact followed when the left front wheel of Mr. Conway's tractor grazed the left rear wheel of the defendant's trailer, causing the loss of Mr. Conway's left front tire. His truck then proceeded across the wrong lane and capsized in the far ditch, killing him instantly. Both trucks were traveling at about 55 miles per hour, both drivers were experienced, and the weather was dry and clear. Neither a defective condition of either vehicle nor any outside factor figured in the collision; the trucks simply clipped mirrors and collided glancingly at some point close to the center of the road. By obvious deduction from the mirrors' dimensions, the cabs of the two trucks cannot have been more than about two feet apart at the moment of initial impact but may have been much closer. No physical evidence at the point of initial impact established conclusively where either vehicle was with reference to the centerline, or whether they were running precisely parallel or at a slight angle to each other. With the above rather considerable body of undisputed, pertinent matter, agreement ends.

The disputed area of evidence arises from the effort of each side to establish that the other driver was on the wrong side of the road. Two expert witnesses for the plaintiffs opined that, based on their calculations from the physical facts, the rear of defendant's trailer was slightly over the centerline. On the other hand, defendant's driver, Mr. Johnston, the sole surviving eyewitness, testified that the trucks were running parallel, each in its own lane, until Mr. Conway's vehicle suddenly angled across the centerline toward him. Investigating highway patrolmen—the only disinterested witnesses—generally supported Johnston's version, as did defendant's collision expert.

Save for Johnston's testimony, all the testimony on both sides rested on deductions from brake marks before the collision, gouge marks after it, the minute trajectories of these marks, and the physical dimensions of the trucks and of the road. Some of these deductions are extremely problematical and finely drawn. Nothing in the physical facts, which were demonstrated by a plethora of photographs, measurements, testimony, and the like, is necessarily inconsistent with the view that the jury appears to have taken: that at the time of the mirror collision, each truck was on its own side of the four-inch centerline, albeit barely, traveling roughly a parallel course to the other, and that uncontrollable acts thereafter made a collision inevitable. Most, if not all, of the actual, physical evidence supports such a view as well as it does any other; so does the testimony of defendant's driver Johnston, except with respect to Mr. Conway's last-minute angling across the centerline, which the jury need not have credited.

In urging that the evidence does not support the jury's view, the plaintiffs attack it along two fundamental lines. One of these need not detain us long. Plaintiff contends that the jury did not adopt the factual position of either party—that the other's truck was on the wrong side of the road when the mirrors collided—but instead improperly adopted a middle ground urged by neither party.[2] An element of the Solomonic, however, necessarily inheres in factual decisions where evidence is fragmentary, conflicting, and interested. It is the office of the jury to make such judgments. Suffice it to say that there was ample evidence before the jury to support a conclusion that both vehicles were on their proper sides of the road, close to the centerline, an instant before the mirror collision.[3] Moreover, the testimony that placed one vehicle or the other slightly on the wrong side of the road was that of experts and of the surviving interested witness, all of which the jury could properly accept or reject in such parts and degrees as it thought best.[4]

2. It may be illustrative to translate this contention into a simpler factual example, that of an auto-pedestrian collision in a 35-mile-per-hour zone. At trial the injured and interested pedestrian testifies that in his opinion the vehicle was traveling at a speed of 50 m.p.h. The equally interested driver testifies to a speed of 25 m.p.h. There is no other evidence. Plaintiffs' contention would have it that the jury must find either 25 or 50 and that a verdict of 40 would be without support in the evidence. By a certain neat logic, this reasoning may be viewed as correct; it does not, however, represent the common law's view. By discounting each party's views for such factors as the strength of his interest, his ability to perceive, his opportunity to perceive on the occasion testified about, his veracity and accuracy in other testimony, and the like, the jury may permissibly arrive at any figure between 25 and 50, though perhaps none outside that range.

3. Each side offered evidence that its driver was in his own lane at the time of the mirror impact. Mr. Grady Purtle, safety director of Mr. Conway's truck line at the time of the accident, testified that brake marks apparently left by Mr. Conway's vehicle immediately before the initial impact ran parallel to the centerline, approximately six inches from it, for a distance of 42 feet on Mr. Conway's side of the road. In the opinion of Dr. Swiki Anderson, another plaintiffs' expert, there was nothing to indicate that Mr. Conway's vehicle was over the centerline prior to the clipping of the mirrors. Dr.

Anderson further testified that, in his view, Mr. Conway was six to twelve inches into his own lane even at the time of the second impact.

With respect to defendant's vehicle, its driver testified that he remained at all times in his own lane and estimated that he was driving approximately a foot on his side of the centerline. The initial conclusions of Patrolman Ben Bean, the officer in charge of investigating the accident for the Texas Highway Patrol, concerning brake marks in the eastbound lane apparently made by defendant's truck also supported the view that defendant's truck was well within its own lane at the time of the collision. *See* n. 4, *infra*.

4. Plaintiffs' contention that defendant's vehicle had crossed the centerline was largely predicated on Mr. Purtle's calculations with respect to brake marks in the eastbound lane. According to Mr. Purtle, Patrolman Bean, in his initial report, had concluded that these dual brake marks had been made by the *left* rear wheels of defendant's vehicle, from which it followed that defendant's truck could not have been across the centerline at the time of first impact. If this were true, however, Mr. Purtle testified, defendant's truck would have extended off the highway to the south and knocked down a sign that had not in fact been hit. He therefore concluded that the brake marks had been made by the *right* rear wheels of defendant's vehicle and that defendant's truck was thus across the

Given the totality of the evidence presented, it was perfectly reasonable for the jury to conclude that neither driver crossed the centerline before the mirrors collided but that each either held his course or angled away when he saw the other truck approach. That neither side found it expedient to take this view of the facts at trial could not prevent the jury from finding the facts as it saw them. As noted above, each party contended and offered evidence that his driver was in his own lane at mirror impact; certainly the jury could have accepted these contentions while rejecting each party's claims about the location of the other vehicle.

centerline. Dr. Anderson corroborated Mr. Purtle's conclusions. Mr. Purtle further testified that when he explained his reasoning to Patrolman Bean, the officer agreed that defendant's vehicle must have been across the centerline.

This testimony, however, was by no means conclusive, particularly in light of testimony by defendant's collision expert, Mr. Arnold Hays, that the skid marks in issue had not even been made by defendant's vehicle. Mr. Hays posited that the brake marks had been made by a single-axle vehicle rather than a tandem one like defendant's. The jury could thus have justifiably disregarded *all* evidence with regard to these brake marks. In any event, Mr. Purtle's credibility may have been undercut by his admission that he could not tell from the skid marks whether they had been made by a single-axle or a tandem vehicle.

Defendant's contention that plaintiff's truck was over the centerline at the time of mirror impact was premised on testimony by its driver to that effect. Testimony by defendant's expert that plaintiff was across the line "at the time of the collision" provided additional support for defendant's view.

The jury need not, however, have fully credited such testimony by either witness. Defendant's driver also testified that Mr. Conway stayed in his own lane "until he was almost right on to me." Given Mr. Conway's many years of experience as a truck driver and the jury's understanding of human nature, the jury was fully entitled to believe that Mr. Conway remained in his own lane at the time of mirror impact rather than believe that he unexpectedly crossed the centerline. With regard to the expert's testimony, the fact that Mr. Conway's vehicle may have been across the centerline at the time of the *second* impact does not necessarily indicate that he had crossed the centerline at the time of the *initial* impact. Similarly, the presence on defendant's side of the centerline of gouge marks and debris resulting from

Plaintiffs' second line of attack is somewhat more sophisticated: that given the combined closing speeds of the two vehicles, there was insufficient time after the mirror impact for either driver to do *any* act, "uncontrollable"—as the jury found—or otherwise, to cause the collision. In their motion for a new trial, plaintiffs characterize as a physical impossibility, contrary to "common scientific principles of space and time," the jury's finding that "after striking mirrors, within a period of one-third or one-half a second, . . . each driver was able to react and lose control of his vehicle." [5] In the absence of direct evidence, we are unable to turn our decision on

the second collision does not necessarily contradict the jury's finding that Mr. Conway was on his own side of the centerline at the time of the mirror impact.

5. The motion goes on to assert, without direct support in the evidence, that it is "well-known" that reactions of such quickness could not have occurred. The suggestion is disturbing; had it been more fully developed and supported below, it would be troubling indeed. As matters stand, however, we would not be justified in reading into the trial court's order an unstated judicial notice of the drivers' reaction times, taken without giving any intimation to either party, or any opportunity for a request to be heard as Fed. R. Evid. 201(e) requires.

Nor have we been requested to take such notice in support of the order below. Even so, we have discretion under Rule 201 to do so without request, and we have carefully considered the propriety of our doing so even at this late stage of the proceedings. It is true that some courts have judicially noticed usual human reaction time at 3/4 of a second. *See, e. g.,* cases cited at 31A C.J.S. *Evidence* § 79, at 81 n.95 (2) (1964). For several reasons, we conclude that we should not do so here.

In the first place, for us to take judicial notice, on our own initiative and for the first time on the appeal after a third trial, would be a judicial act so extreme as perhaps to raise questions of due process. We would take such an action only on very clear data indeed, much clearer than that before us. In the second place, the authorities cited in the treatise above refer to "usual" or "normal" reaction times, a doubtful gauge for the capabilities of experienced professionals, doubtless tensed for action. Finally, we would be chary of doing so in view of such recorded reaction-time statistics as are given in the Guinness Book of Records, which we note but do not notice: .0175 second to draw a holstered gun and fire (B. Mun-

assumptions about human reaction times, especially those of experienced drivers who in the circumstances presented may well have been tensed to act or beginning to do so even before their mirrors collided.[6]  In fact, defendant's driver testified that after the mirror impact, "I looked for him [Mr. Conway] to hit right behind the cab, but apparently, *he yanked his steering wheel back* and the next time he hit me was then on my trailer." (emphasis added).  The following testimony of Mr. Grady Purtle, one of plaintiffs' expert witnesses, also supports the view that Mr. Conway reacted almost instantaneously to the impact of the mirrors:

> A:  My opinion is that when you realize the truck [defendant's] was across the centerline, instinct made him [Mr. Conway] hit the brake.  They clipped mirrors, and if you will notice the photographs, our mirror— the Dixie mirror—was pushed in on the driver's [Mr. Conway's] window, breaking it, shattering it.  That's when he released and dodged, that is my opinion, *that's when he released the brake and dodged because of the impact of the mirror in his face.*
>
> Q:  All right, what you believe moved him to the south [wrong] side of the highway, the wheel or—
>
> A:  *Turning loose.*

(emphasis added).  Thus, there was testimony from which the jury could conclude that Mr. Conway had sufficient time to act and did in fact act between the mirror impact and the subsequent collision.

There was also testimony by plaintiffs' other expert, Dr. Anderson, that the trucks might have been as close to each other as a foot and a half and that Mr. Conway's truck may have swung into the other at a very slight angle—about 3.4 degrees—to produce the second impact.  Dr. Anderson rejected this hypothesis because of his general opinions about closure velocity and driver reaction-times, though he gave no specific opinion on these basically neurological matters.  The jury, however, need not have rejected it.  Indeed, the jury could have accepted the testimony of defendant's driver that Mr. Conway's vehicle angled toward him just before the impact, without concluding that it actually crossed the centerline at that time;  it could have believed that the vehicles were so close at the time of the mirror collision (perhaps within a few inches) that the most miniscule alteration of course by either made the second impact inevitable;  or it could have adopted any of several other hypotheses.

The phrase "uncontrollable acts," moreover, is manifestly broad enough to include *involuntary* acts that require no reaction time at all.[7]  On the basis of Mr. Purtle's testimony, set out above, the jury would not have been remiss in concluding that Mr. Conway had been involuntarily torn from the controls of his vehicle by the impact of the truck mirror on his face, and that the second collision followed because of his involuntary "turning loose."

■  Much the same course of reasoning applies to the evidence supporting the jury's findings as to the conduct of defendant's driver, Johnston.  Arguably, it matters not whether Johnston was negligent or whether any act of his contributed to the accident, since a finding of negligence on the part of plaintiffs' decedent would preclude recovery under the contributory negligence doc-

---

den);  .45 second to fire five shots into a target fifteen feet away, striking within an area the size of a half dollar (E. McGivern, August 30, 1932).  We need not fully credit these record feats in order to conclude that without evidence we cannot here draw critical inferences based on extra-record assertions about the speed of human reaction times.

**6.**  Johnston, indeed, testified that he was already veering away before the collision of the mirrors occurred.

**7.**  Dr. Anderson testified that Mr. Conway would not have been able *deliberately* to change the direction of his truck after the mirror impact.  Even if this assertion is true, it does not signify that Mr. Conway could not have been forced by circumstances beyond his control to alter the vehicle's course.

trine—bar—in effect in Texas at the time of the accident.[8] *Burkes v. Koppers Co.,* 567 S.W.2d 540 (Tex.Civ.App.—Tyler 1978, no writ). But the jury could have concluded that Johnston's loss of control contributed in some measure to the final impact, as by causing him to aggravate—or by making it impossible for him to moderate—his wrenching veer to the right, which plaintiffs' expert opined caused part of his trailer to swing out toward Mr. Conway's cab.

■ To conclude, the evidence was profuse, somewhat fragmentary, and conflicting in critical areas. Given a jury's undoubted power to sift the evidence before it and to believe or disbelieve portions of the testimony of various witnesses (or even of the same witness) in constructing its own view of what most probably happened, this jury could have reached a number of different conclusions, all of which would have sufficient support in this evidence to be upheld. Here there *is* no great weight of the evidence in any direction. On this record, the jury's conclusions are at least as likely to be true as any others, are not at variance with any established physical laws, and are not against any great evidentiary weight. Therefore, because the trial court's order, viewed in the most favorable light, holds to the contrary, it was entered in an abuse of discretion.[9]

We conclude that the second verdict was valid and that there was no need for a third. Since by that verdict the jury determined that the negligence of plaintiffs' decedent was a proximate cause of his death, the judgment below is reversed, and the cause is remanded with instructions to enter judgment upon that verdict for defendant.

REVERSED AND REMANDED.

---

8. Had the matter been raised or considered below, a problem might have been presented by the circumstance that this accident occurred before, but the trials after, Texas abolished the contributory negligence bar and adopted a comparative negligence statute of the "over 50%" variety. Tex.Rev.Civ.Stat.Ann. art. 2212a (Vernon). We doubt, however, that either driver here could properly be viewed as more at fault than the other, since each was found to have committed the identical negligent act. Moreover, we have discovered only one Texas authority involving a claim that arose before the law was changed but was tried afterwards; it specifically rejects the application of comparative negligence and bars plaintiff's recovery. *Burkes v. Koppers Co.,* 567 S.W.2d 540 (Tex.Civ.App.—Tyler 1978, no writ). It is the only word on the subject from a Texas court, and we must follow it.

9. The terminology is unfortunate. The phrase "abuse of discretion" has no pejorative content. It means to us no more than that the court has clearly erred. *See* 6A *Moore's Federal Practice* ¶ 59.08[6] at 59–175 (1979).