671 F.2d 927
 10 Fed. R. Evid. Serv. 307
 Colon SHOWS, (Margaret P. Shows, Administratrix of the
estate of appellee Colon Shows, for substitution
in the place and stead of appellee Colon
Shows, deceased), Plaintiff-Appellee,
v.
JAMISON BEDDING, INC. and Mallon Dobbins, Defendants-Appellants.
 No. 80-3517.
 United States Court of Appeals,
Fifth Circuit.
 April 2, 1982.
 
 Aultman & Aultman, Lawrence C. Gunn, Jr., Hattiesburg, Miss., for defendants-appellants.
 Pickering & McKenzie, Charles W. Pickering, R. Kelton Pickering, Franklin C. McKenzie, Jr., Laurel, Miss., for plaintiff-appellee.
 Appeal from the United States District Court for the Southern District of Mississippi.
 Before WISDOM, SAM D. JOHNSON and WILLIAMS, Circuit Judges.
 WISDOM, Circuit Judge:
 
 
 1
 This negligence case arises from a traffic accident in Mississippi. The case was tried to a jury, which returned a verdict for the defendants. On motion of the plaintiff, the district court granted a new trial. At the second trial, the jury returned a verdict of $600,000 for the plaintiff. The defendants now appeal from the judgment on the second verdict, requesting reinstatement of the first jury verdict or, alternatively, a new trial on the question of damages or a remittitur. We affirm the district court.
 
 I. Facts and Proceedings Below
 
 2
 The accident occurred at about 7:30 a.m. on April 19, 1976 on the I-59 highway in Laurel, Mississippi. The pickup truck in which Colon Shows was riding entered the highway from a cloverleaf ramp just north of the point where I-59 forms a bridge over Highway 84. The pickup headed south along I-59, remaining in the merging lane for 40-45 feet before moving leftward into the righthand freeway lane. At this time it was going less than the 30 m.p.h. required on freeway lanes in Mississippi, Miss.Code Ann. § 63-3-509. Shortly after entering the freeway lane, the pickup was struck from behind by an 18-wheel tractor-trailer owned by Jamison Bedding and driven by its employee, Mallon Dobbins. The pickup was thrown from the road and down an embankment.
 
 
 3
 After the accident, Shows was treated for a broken left arm, a fractured and dislocated right wrist, a broken rib, a concussion, and a deep scalp wound. A few months later he was hospitalized again for a bone graft in his left arm. He was rehospitalized a few days later, when he developed an infection in the hip from which the bone for the graft had been taken. He was hospitalized a fourth time, several months later, for surgery on his right wrist. He spent a total of about 30 days in the hospital and was off work for about two years.
 
 
 4
 Before the accident, Shows was a "working foreman" earning $14,685 a year. Afterwards, he stopped doing physical work and earned $21,091 a year as a foreman. His total lost wages were $32,704.96. Medical expenses were $11,235.33, and total special damages were thus $43,940.29.
 
 
 5
 Shows sued Jamison Bedding and Mallon Dobbins in the United States District Court for the Southern District of Mississippi. His complaint alleged that the defendants were negligent, Dobbins directly and Jamison Bedding vicariously, in that Dobbins was exceeding the speed limit and failed to keep a reasonable lookout, to have the vehicle under reasonable control, or to cut to the left or right to avoid the collision. The main issue at the first trial was the precise location of the collision. If the trucks collided on the bridge itself, immediately after the pickup entered the freeway lane, then the jury might have concluded that the pickup driver's negligence per se in driving below the statutory minimum was the sole cause of the accident, or that he negligently shot out in front of the tractor-trailer. If they collided later, when the pickup was south of the bridge, then the pickup would have increased its speed to the legal level, and it would be highly improbable that the defendants were not at least partly responsible for the accident.[1] The parties also disputed whether, at the time of the collision, there was another vehicle to the left of the tractor-trailer, preventing Dobbins from avoiding the collision.
 
 
 6
 The jury returned a verdict for the defendants. Upon motion by the plaintiff, the judge set aside the verdict and ordered a new trial on the grounds that the verdict was "against the clear, great, and overwhelming weight of the evidence" and so contrary to the evidence as to evince bias, passion, and prejudice on the part of the jury, and that the testimony of the defendant, Dobbins, was so contradictory of his previous statements and deposition, and so contrary to physical laws and facts, as to be incredible.
 
 
 7
 At the second trial the jury returned a verdict for the plaintiff and awarded him $600,000 in damages. The defendants moved for judgment notwithstanding the verdict, or in the alternative for a new trial or a remittitur. The court denied the motions, and the defendants appealed, requesting reinstatement of the initial jury verdict in their favor[2] or, alternatively, a new trial on the question of damages or a remittitur.
 
 II. The New Trial Order
 A. The Legal Standard
 
 8
 The decision to grant or deny a motion for a new trial is generally within the sound discretion of the trial court, and reversible only for an abuse of that discretion. 6A Moore's Federal Practice P 59.08(5) at 59-156 to 163; 11 C. Wright & A. Miller, Federal Practice and Procedure § 2812 at 118-19 (1973). This deferential standard of review has largely arisen from the consideration of cases in which motions for new trials have been denied. See Taylor v. Washington Terminal Co., D.C.Cir.1969, 409 F.2d 145, 148 (Wright, J.), cert. denied, 396 U.S. 835, 90 S.Ct. 93, 24 L.Ed.2d 85. When the trial judge has refused to disturb a jury verdict, all the factors that govern our review of his decision favor affirmance. Deference to the trial judge, who has had an opportunity to observe the witnesses and to consider the evidence in the context of a living trial rather than upon a cold record, operates in harmony with deference to the jury's determination of the weight of the evidence and the constitutional allocation to the jury of questions of fact. Id.; Massey v. Gulf Oil Corp., 5 Cir. 1975, 508 F.2d 92, 94-95, cert. denied, 423 U.S. 838, 96 S.Ct. 67, 46 L.Ed.2d 57. When the trial judge sets aside a jury verdict and orders a new trial, however, our deference to him is in opposition to the deference due the jury. Consequently, in this circuit as in several others, we apply a broader review to orders granting new trials than to orders denying them. Conway v. Chemical Leaman Tank Lines, Inc., 5 Cir. 1980, 610 F.2d 360, 362 (per curiam). And where a new trial is granted on the ground that the verdict is against the weight of the evidence, we exercise particularly close scrutiny, to protect the litigants' right to a jury trial. Massey, 508 F.2d at 95.
 
 
 9
 In a further effort to prevent the trial judge from simply substituting his judgment for that of the jury, we require that new trials should not be granted on evidentiary grounds "unless, at a minimum, the verdict is against the great-not merely the greater-weight of the evidence". Conway, 610 F.2d at 363 (citing Spurlin v. General Motors Corp., 5 Cir. 1976, 528 F.2d 612, 620). This standard, of course, is lower than that for a directed verdict or a judgment notwithstanding the verdict. United States ex rel. Weyerhaeuser v. Bucon Construction Co., 5 Cir. 1970, 430 F.2d 420, 423. A verdict can be against the "great weight of the evidence", and thus justify a new trial, even if there is substantial evidence to support it. Id.; see also 11 C. Wright & A. Miller, Federal Practice and Procedure § 2806 at 43 (1973). The trial court in passing on a motion for a new trial need not take the view of the evidence most favorable to the verdict winner, but may weigh the evidence. Bazile v. Bisso Marine Co., Inc., 5 Cir. 1979, 606 F.2d 101, 105, cert. denied, 1980, 449 U.S. 829, 101 S.Ct. 94, 66 L.Ed.2d 33; 11 C. Wright & A. Miller, Federal Practice and Procedure § 2806 at 44-45 (1973). This does not mean that a judge may order a new trial simply because he disagrees with the jury verdict. He must be convinced that the verdict is against the great weight of the evidence.
 
 
 10
 On appeal, we review the evidence closely to ensure that this standard has been met. We have also considered three factors that militate against new trials and require a particularly searching review of the evidence: simplicity of the issues, the extent to which the evidence is in dispute, and the absence of any pernicious or undesirable occurrence at trial. Conway, 610 F.2d at 363; Spurlin, 528 F.2d at 620. When all three factors are present, our deference to the jury is reinforced by our confidence in its ability to understand the issues, to evaluate credibility and sort through conflicting testimony, and to act reasonably and fairly in the absence of prejudicial influences. In this situation there is little, if any, need to defer to the judge as against the jury, and we will not affirm an order granting a new trial unless on review we are satisfied, independently, that the jury verdict was against the great weight of the evidence. When one or more of these factors are absent, however, our "great deference to the court's firsthand experience of the witnesses, their demeanor, and the context of the trial", King v. Exxon Co., 5 Cir. 1980, 618 F.2d 1111, 1116, takes on special importance, and we will affirm a new trial order even if on our own review of the "cold record" we are not convinced that the jury verdict was against the great weight of the evidence. It is enough in this situation that, in view of possible considerations not apparent from the written record, we can perceive a sound basis for the trial judge's finding the verdict against the great weight of the evidence. See 13 Stan.L.Rev. 383, 386 (1961).
 
 
 11
 The "great weight of the evidence" standard is not easily met. And our standard of review on appeal in cases of this type is also a strict one, whether or not the three factors referred to above are present. Still, even when all three factors are present, the standard is not impossible to meet, and we have frequently affirmed orders granting new trials on purely evidentiary grounds. See, e.g., United States v. Horton, 5 Cir. 1980, 622 F.2d 144 (per curiam); Bazile; Massey; Weyerhaeuser. In the present case, the plaintiff urges us to find that the issues in the case were complex, that the evidence was hotly disputed, and that the trial was tainted with "pernicious occurrences". Agreement with the plaintiff on any of these points, of course, would lead us to review the district court's action under something less than the strictest standard described above. On our own review of the evidence, however, we agree with the district court that the verdict at the first trial was against the great weight of the evidence, and we therefore need not decide the plaintiff's contentions.
 
 B. The Evidence
 
 12
 On the issue of liability at the first trial, the plaintiff introduced physical evidence and the testimony of four witnesses. The physical evidence consisted of plats of the accident scene and photographs of both the scene and the pickup. The plats showed that the distance from the entrance ramp where the pickup entered the highway to the north end of the bridge is 167 feet and that the bridge is 125 feet long. The photographs of the scene showed skid marks south of the bridge but none on the bridge itself. The photographs of the pickup showed a dent on the left side of the rear of the truck.
 
 
 13
 James Creel was the driver of the pickup in which the plaintiff was riding. He testified that when he reached the top of the cloverleaf ramp, he saw the defendants' truck 900 to 1,000 feet to the north, heading south. Tr. II, 168. He remained in the merging lane for about 15 yards and then entered the righthand freeway lane, at about 15 m.p.h. II, 168-69, 192. He testified that there was only one collision and that it occurred about 159 feet south of the bridge. II, 195-196. At the time of the collision he was going about 35 m.p.h. II, 200. Creel observed no other vehicle in the immediate vicinity of the defendant. II, 172.
 
 
 14
 Don Alan Sumrall, a patrolman with the Mississippi Highway Patrol, was driving north on I-59 when the accident occurred. He testified that he passed the pickup in which the plaintiff was riding as he crossed the bridge. II, 83. At this time the defendants' truck, according to Sumrall, was 1,000 feet away. II, 104. His radar subsequently picked up a speeding alarm from the defendants' truck, which it showed to be going 68 m.p.h. II, 88. After passing the defendants' truck, Sumrall was stopped by Kenneth Ishee, one of the plaintiff's other witnesses, who reported the accident. Sumrall returned to the scene, where he found the pickup about 60 feet off the side of the road, 30 feet down an embankment. II, 91. He also found skid marks and debris south of the bridge, but none on the bridge. I, 94, 98. The defendants' truck was pulled over to the side of the road 600 feet south of where the pickup left the highway. II, 99.
 
 
 15
 Kenneth Ishee was a high-school student, on his way to school when the accident occurred. He had entered I-59 northbound from the cloverleaf ramp and saw the pickup at the south end of the bridge, going 40-50 m.p.h. II, 142-44. He testified that the defendants' truck entered the bridge from the north at about the same time as he entered it from the south. II, 143. The tractor-trailer was going about 70 m.p.h. II, 146. As he proceeded northward, he saw the collision behind him, 200-300 feet south of the bridge. He observed no other vehicle in the immediate vicinity of the collision. II, 147. Ishee caught up with Officer Sumrall and reported the collision.
 
 
 16
 Percy Young, a member of the Laurel Police Force, was the investigating officer. When he arrived at the scene he found skid marks and debris south of the bridge. II, 130. He paced off the distance from the south end of the bridge to the beginning of the skid marks, which Dobbins identified as having been left by his truck, and found the distance to be about 140 feet. II, 121. He measured the skid marks, and they were 119 feet long. II, 120. He also found scuff marks beginning at about the middle of the skid marks. II, 129, 131. Young questioned both drivers, and Dobbins told him that he had hit the pickup at about the middle of the skid marks (or 200 feet south of the bridge). II, 130. Dobbins also told Young that the pickup had just stopped in front of him, and that another vehicle on his left made it impossible to avoid colliding. Id.
 
 
 17
 The defendants introduced three witnesses on the question of liability: Dobbins, the driver-defendant; Ron Cheatham, a USM football coach who was driving behind Dobbins at the time of the collision; and Donis Collins, a Laurel policeman, who assisted Patrolman Young in investigating the accident.
 
 
 18
 Dobbins testified that he was crossing the bridge at about 54-55 m.p.h., when the pickup shot out in front of him, about midway across the bridge, and they collided. III, 436, 437, 439. He stated that he tried to swerve to the left but was unable because a car was passing him in the lefthand lane. III, 437. After straightening out his rig, he applied his brakes but was unable to avoid the collision. III, 438. According to Dobbins, he could not apply his brakes while trying to swerve, because this would have caused his rig, which had separate brakes for the tractor and the trailer, to jackknife. Id. He also testified that it is common, in view of the way tractor-trailer brakes function, for a truck not to begin skidding for some distance after the brakes are initially applied, and that he had not begun to skid when he hit the pickup. III, 442-43.
 
 
 19
 Dobbins stated that he hit the pickup squarely from behind. III, 439, and that the pickup's taillights then went on, as Creel tried to brake. III, 443. Dobbins then slid into the pickup, hitting it on the left rear side. Id. At the time of this second impact, Dobbins had begun to skid.
 
 
 20
 Ronald Cheatham was driving south on I-59 when the collision occurred. III, 469. The Jamison truck had passed him north of the bridge and was driving ahead of him. III, 470. According to Cheatham, the truck collided "as soon as (the pickup) got in the interstate". III, 471. The collision was "on the bridge" or "pretty close to the bridge". III, 473. Cheatham saw no vehicle in the vicinity of the Jamison truck that would have prevented it from moving to the left. III, 477.
 
 
 21
 Officer Collins testified that he found electrical parts, bolts, wires, and clamps from the pickup lying on the road "three or four joints" in the highway asphalt south of the bridge. III, 466. This would place the debris about 60 feet south of the bridge, further north than the plaintiff's version would place the collision, but further south than the defendants' would. Collins did not pace off the distance from the bridge to the debris. III, 467.
 
 
 22
 Significant problems with the defendants' evidence support the trial judge's grant of a new trial. The defendants' main witness on liability was the driver, Dobbins.[3] Yet his testimony was so riddled with inconsistencies as to be barely credible, if credible at all. Moreover, neither of the defendants' other liability witnesses fully supported Dobbins's account.
 
 
 23
 Dobbins's testimony that he hit the pickup twice is inconsistent with his statement at the scene of the accident that there was only a single impact, south of the bridge.[4] See II, 130. Both statements contradict his statement at deposition that there was a single impact, on the bridge. Dep. 10, 38; II, 45. And his testimony that he initially hit the pickup "straight on", at highway speeds, while the pickup was either stopped or moving slowly, is inconsistent with his testimony that the pickup's tail-lights subsequently came on, and with the damage to the pickup, which was dented only on the left side. In the light of these and other[5] contradictions, and the fact that Dobbins is a defendant in the case, we must agree with the district court that Dobbins's testimony could not be the basis of a verdict for the defendants.
 
 
 24
 The defendants argue, in their reply brief, that Dobbins's testimony can be "completely ignored", and Cheatham's testimony alone can support the first jury verdict. Although Cheatham testified that the collision occurred on, or near, the bridge, however, he saw no vehicle preventing Dobbins from avoiding the collision. More important, even if Cheatham's testimony, taken in isolation, constituted substantial evidence favoring the defendants, this would not warrant reversal here. For present purposes, Cheatham's testimony must be seen against the background of all the evidence together. And the "great weight" of the evidence contradicts Cheatham's account.
 
 
 25
 The defendants point to several problems and inconsistencies in the plaintiff's evidence, but none rises to the level of seriously impairing the witnesses' credibility. Ishee, who was driving north, had passed both trucks before the collision occurred, and could thus see the collision itself only by looking over his shoulder, or into his mirror. He had passed the pickup as it was leaving the bridge, however, and could clearly see that the collision had not yet occurred. The defendants also note several contradictions between the testimony of Sumrall and Ishee concerning the distance between them, and the distance between each of them and the trucks involved in the collision. But the distances cited by Ishee and Sumrall must be taken as rough estimates made by persons who were themselves in motion at the time. Moreover, these precise distances are not critical to the plaintiff's case. Far more important are the rough intervals at which the various vehicles passed over the bridge. Finally, the defendants point out that one of the photographs in evidence shows skidmarks closer to the bridge than the plaintiff's witness placed them. But even this photograph does not place skid marks on the bridge, and does not support the defendants' account of the collision.
 
 
 26
 In summary, we recognize that there may be, in Cheatham's testimony, substantial evidence to support the first jury verdict in this case. If we were considering a directed verdict or a judgment notwithstanding the verdict, we might be required to reverse. But we agree with the district court that the testimony of Ishee, Sumrall, and Young, along with the photographs of the scene, constituted the "great weight of the evidence", and justified the granting of a new trial.
 
 III. The Damage Award
 
 27
 This court has firmly established in previous cases that it will not reverse a jury verdict for excessiveness except on "the strongest of showings". Bridges v. Groendyke Transport, Inc., 5 Cir. 1977, 553 F.2d 877, 880. The size of the award a plaintiff is entitled to is generally a question of fact, and the reviewing court should be "exceedingly hesitant" to overturn the decision of the jury-the primary factfinder-and the trial judge who concurred with its verdict. Id. Thus, we have upheld the denial of a new trial on the question of damages even when we have disagreed with the award. See id. at 881 & n.2. We will reverse an award as excessive only when it "clearly exceeds that amount that any reasonable man could feel the claimant is entitled to". Id. at 880 (emphasis in original). See also Bailey v. Southern Pacific Transport Co., 5 Cir. 1980, 613 F.2d 1385, cert. denied, 1980, 449 U.S. 836, 101 S.Ct. 109, 66 L.Ed.2d 42. The defendants here have not satisfied this strict standard.
 
 
 28
 The dispute over the measure of damages concerns the plaintiff's pain and suffering and, specifically, the psychological effect on him of the accident. The plaintiff introduced the testimony of his wife, daughter, family physician, and fellow workers, as well as a psychiatrist and an orthopaedic surgeon. A second orthopaedic surgeon, who examined the plaintiff at the request of the defendants' counsel and on order of the court, also testified. The plaintiff's evidence tended to establish that he experienced much pain during his recovery; that his disposition had changed from robust and outgoing to sullen; that he would be disabled from doing physical labor for the rest of his life; that he would have permanent pain and headaches as a result of an aggravated spinal arthritic condition; that he had become impotent, though possibly only partially; that further surgery on his wrist might be necessary, at a cost of $3000; and that he suffered a total physical impairment of 45%.
 
 
 29
 The defendants seek to discredit the plaintiff's evidence by pointing out that some of it is nonspecific and that the psychiatrist's testimony-the only medical testimony on impotence-was given at a deposition more than a year before the trial. But these arguments do not sufficiently discredit the plaintiff's evidence to warrant finding that the jury was unreasonable in accepting it. We must therefore consider whether, in view of the injuries established by the plaintiff, the award of $600,000 "clearly exceeds that amount that any reasonable man could feel (he) is entitled to".
 
 
 30
 To show that this standard is satisfied, the defendants refer us to several Mississippi cases involving smaller awards for purportedly comparable injuries. In most of these cases, however, the jury verdicts were upheld, and they thus shed no light on how high an award must be to be "excessive". See McNair Transport, Inc. v. Crosby, Miss.1979, 375 So.2d 985 (additur reversed); Walton v. Scott, Miss.1978, 365 So.2d 630; Swaggart v. Haney, Miss.1978, 363 So.2d 251; Arrow Food Distributors, Inc. v. Love, Miss.1978, 361 So.2d 324, cert. denied, 439 U.S. 1073, 99 S.Ct. 845, 59 L.Ed.2d 39; Louisville & Nashville RR. v. Hasty, Miss.1978, 360 So.2d 925, cert. denied, 439 U.S. 1003, 99 S.Ct. 614, 58 L.Ed.2d 679. Those cases that did disapprove awards do not support the defendants' position. In Warner v. City of Bay St. Louis, 5 Cir. 1977, 552 F.2d 583 (per curiam), this court reduced an award because of comparative negligence, not because it was excessive in view of the injuries. In MFC Services v. Lott, Miss.1975, 323 So.2d 81, the reviewing court granted a remittitur because the initial award was "palpably against the preponderance of the evidence", obviously an easier standard for the defendant to meet than the one we apply. And in James Reeves Contractors, Inc. v. Chain, Miss.1977, 343 So.2d 1229, where an award of $150,000 was reduced to $100,000, the plaintiff's special damages were about one-fourth those of the present plaintiff.
 
 
 31
 If the authority the defendants rely on were more compelling than it is, we would still not have grounds to reverse the award in this case as excessive. As the plaintiff points out, courts have frequently upheld verdicts in which pain and suffering, both mental and physical, have resulted in awards ranging from $500,000 to over $1,000,000. See, e.g., Bevevino v. Saydjari, 2 Cir. 1978, 574 F.2d 676; Frankel v. Heym, 3 Cir. 1972, 466 F.2d 1226; Garzilli v. Howard Johnson's Motor Lodges, Inc., E.D.N.Y.1976, 419 F.Supp. 1210; Anderson v. Sears, Roebuck & Co., E.D.La.1974, 377 F.Supp. 136. Even if we were convinced that the cases cited by the defendants were more comparable to the present case than those the plaintiff cites, our deference to the jury as the finder of fact in individual cases would make us exceedingly hesitant to reverse on this ground alone. We must conclude that the award in this case is not so excessive as to require reversal.
 
 IV. Conclusion
 
 32
 Although the verdict in the first trial might have been supported by substantial evidence, we agree with the district court that it was against the great weight of the evidence and hold that it was not error to order a new trial. For the reasons discussed above, we also hold that the verdict at the second trial was not excessive and that the district court did not err in denying the defendants' motion for a new trial or a remittitur. The judgment of the district court is therefore AFFIRMED.
 
 
 
 [1]
 Since the plaintiff was not driving the pickup, there is no question of negligence on his part diminishing his recovery, see Miss.Code Ann. § 11-7-15. Even if the driver of the pickup was negligent, and his negligence contributed to the injury, the defendants are liable for the entire damages if their negligence contributed at all. State ex rel. Richardson v. Edgeworth, Miss. 1968, 214 So.2d 579, 588; Westerfield v. Shell Petroleum Corp., 1932, 161 Miss. 833, 138 So. 561, 562
 
 
 [2]
 The appropriate time to seek appellate review of an order granting a new trial is on appeal from a final judgment after the second trial. See Massey v. Gulf Oil Corp., 5 Cir. 1975, 508 F.2d 92, 99, cert. denied, 1975, 423 U.S. 838, 96 S.Ct. 67, 46 L.Ed.2d 57
 
 
 [3]
 Dobbins's testimony on direct examination occupies 11 pages of the trial transcript, as compared with 7 pages for the direct testimony of both other defense witnesses together. Dobbins's total testimony occupies 95 pages, as compared with 15 pages for the other defense witnesses. See II, i-ii
 
 
 [4]
 Since Dobbins's statement to Officer Young was not hearsay, Fed.R.Evid. 801(d)(2), it not only impeaches his credibility, but may be taken to support the plaintiff's version of the facts
 
 
 [5]
 The plaintiff's brief alleges several other inconsistencies in Dobbins's testimony. Although many of these allegations have merit, we need not discuss them in detail, since we find that those discussed in the text sufficiently establish Dobbins's lack of credibility