# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

June 30, 2017

Lyle W. Cayce
Clerk

No. 16-10430

STELLUTI KERR, L.L.C.; ANTHONY STELLUTI; PAMELA STELLUTI,

     Plaintiffs - Appellants

v.

MAPEI CORPORATION,

     Defendant - Appellee

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 5:10-CV-30

Before KING, JOLLY, and PRADO, Circuit Judges.

PER CURIAM:[*]

IT IS ORDERED that the petition for panel rehearing is DENIED. The opinion previously filed in this case, *Stelluti Kerr, L.L.C. v. Mapei Corp.*, No. 16-10430, --- F. App'x ---, 2017 WL 2274288, is WITHDRAWN. The following opinion is substituted therefor:

Plaintiffs–Appellants Stelluti Kerr, L.L.C. and its principals sued Defendant–Appellee Mapei Corporation for breach of contract and tortious

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

## No. 16-10430

interference with an existing contractual relationship between Stelluti Kerr, L.L.C. and a third-party, Arodo BVBA. After they prevailed on both claims before a jury, the district court granted judgment as a matter of law against Plaintiffs–Appellants and conditionally granted a new trial. We REVERSE in part, AFFIRM in part, and REMAND for entry of judgment.

### I. FACTS AND PROCEEDINGS

**A. Factual Background**

This case involves a dispute between Stelluti Kerr, L.L.C. (SK) and Mapei Corporation (Mapei) over the Arovac, a machine used to package the cement-based powders that, when mixed with water, become the mortars and grouts used in tile installation. Historically, these powders have been packaged in paper bags, which are prone to leaking and breaking open. The Arovac, however, packages these powders in plastic bags, which are less prone to leak and break. The Arovac is manufactured by Arodo BVBA (Arodo), a Belgian company.

In early 2006, SK and Arodo entered into an agreement for SK to distribute the Arovac in North America on a non-exclusive basis (the Distributorship Agreement). The Distributorship Agreement was for an indefinite duration. At the time, the Arovac was only a prototype, but the parties believed the Arovac would soon be perfected and decided to exhibit the plastic bags that the prototype was producing at a trade show in May 2006. Mapei, a Florida-based manufacturer of (among other things) cement-based tile adhesives, saw the plastic bags at that show and was immediately interested.[1] Mapei had recently lost a major multi-million dollar contract with a big-box retailer, which had contracted with a competitor using a cleaner bag

---

[1] Although Mapei is based in Florida, it is one of several wholly owned subsidiaries of Mapei, S.P.A., a privately owned company based in Italy.

than Mapei. To win back that contract, Mapei was actively searching for a cleaner package, which Mapei believed the Arovac could ultimately produce.

SK and Mapei agree that, after their introduction at the 2006 trade show, they formed a contract, but do not agree on much beyond that, including whether the contract was for the sale of one Arovac or 14 Arovacs. Accordingly, the facts underlying the formation of the parties' contract require a close recounting.

*1. The Price Quotation Request and the "Gentlemen's Agreement" on Exclusivity*

After the 2006 trade show, Mapei invited SK to attend an August meeting at its headquarters with the steering committee tasked with winning back its lost contract with the big-box retailer. The attendees agree that Mapei requested SK's best price quote for one Arovac and that a "gentlemen's agreement" was reached on exclusivity for the Arovac, pursuant to which SK would not sell the Arovac to Mapei's competitors in North America. The exact contours of the agreement, however, are disputed. According to SK, it could not commit to exclusivity without Arodo's consent, so the "gentlemen's agreement" was merely that SK would not sell the Arovac to Mapei's competitors while the three parties worked out a more definite agreement on exclusivity. But according to Mapei, the "gentlemen's agreement" was that SK would not sell the Arovac to Mapei's competitors and, in exchange, Mapei would not buy packaging machines from SK's competitors. Yet Mapei was not committed to buy, and would not buy, more than an initial pilot Arovac without a new contract from the big-box retailer.

After the meeting, Arodo consented to an exclusive arrangement between SK and Mapei for distribution of the Arovac. Arodo's consent, however, was conditioned upon Mapei committing to purchase a certain (unspecified) number of machines. Between August and October, SK

No. 16-10430

requested on several different occasions that Mapei disclose the number of Arovacs that Mapei was committed to purchase to obtain exclusivity. In November, SK, still without a number from Mapei, sent Mapei the price quotation for one Arovac it requested. The quotation was highly detailed, totaling nearly fifty pages in length. Page 38 of the quotation included a provision captioned "**Exclusivity**," which stated that, "[i]f the first machine operates as specified in this order, Mapei agrees to a commitment to purchase a pre-determined quantity of AROVAC machines exclusively from SK . . . , which must be specified at time of order and SK will grant Mapei exclusivity to the AROVAC bag for its industry (cement based tile adhesives)."

Mapei responded to the price quotation with a letter of intent to SK in December, expressing Mapei's desire to purchase one Arovac "on a trial basis per your quotation" and requesting "every effort to deliver" the Arovac by May 1, 2007. Mapei viewed the letter as evincing an intent to buy a single pilot machine for demonstration to the big-box retailer, which it could scale up if (and only if) it obtained a written commitment from the retailer. But SK viewed the letter of intent consistent with a commitment from Mapei to buy a certain (unspecified) number of machines because Mapei's commitment was contingent on the first Arovac—still only a prototype—working.

2. *The Production Delays and Division*

On March 17, 2007, SK, Arodo, and Mapei had a meeting where they discussed several design issues with the Arovac and agreed that Mapei would work with SK to finalize engineering details by the end of the month. They also discussed delivery dates for several Arovacs and agreed to divide delivery into essentially two phases. The first phase involved a commitment by SK and Arodo to deliver an initial Arovac to Mapei by December 2007—seven months after the date initially requested by Mapei—with a commitment to deliver three additional machines by February 2008. The second phase involved

4

delivery of a quantity of subsequent machines to be later specified by Mapei. While all sides agree that this division occurred, they offer competing reasons for it. In SK's view, the division was Mapei's response to Arodo's demand for a commitment to purchase a number of machines as the Arovac prototype neared perfection, lest SK and Arodo begin to market the Arovac to others. But in Mapei's view, the division was SK and Arodo's attempt to mitigate the damage that their delays in perfecting the prototype Arovac caused Mapei— namely, thwarting its efforts to obtain a new contract with the big-box retailer and pushing back delivery dates for any subsequent machines Mapei might need in order to scale up in the event it obtained that contract.

### 3. *The Beginning of the CapEx Process and the Price Quotation*

On May 1, 2007, Mapei requested that SK provide "specific items, most of which are machine dimensions, drawings, delivery dates, and other contract specifics . . . to submit the CapEx[2] for internal approval." The next day, Mapei requested that SK submit a revised price quotation to reflect the finalized engineering details and a more detailed cost structure to "allow [Mapei] to procure this equipment for all our North American plant operations where this equipment is applicable (approximately 12-15 machines)."

As SK prepared its revised price quotation, SK pressed Mapei to specify the number of Arovacs that Mapei intended to purchase for delivery in phase two. SK also pressed Mapei to ensure that Mapei's purchase order specified the quantity of subsequent machines. "If the guarantee for subsequent

---

2 "CapEx" refers to Mapei's internal capital expenditure process. Under that process, once a price quotation like SK's is received, the quotation and supporting documentation (such as drawings and specifications) are attached to a form describing the project and its projected economic costs and benefits to obtain various approvals. If a project is over €10,000, approval must be obtained from Mapei's United States CapEx team as well as Dr. Giorgio Squinzi, the chief executive officer, chairman, and majority shareholder of Mapei's Italian parent company. Only after all the necessary approvals are obtained may a purchase order be issued.

machine[s] is not included in your [purchase order]," SK wrote, "Mapei shall not obtain exclusivity." On May 14th, Mapei informed SK that "it is a little too soon to give you a final answer [on the number of Arovacs] since we need approval from our Italian colleagues[3]," but "if you want a number th[e]n you can put down 2/quarter, assuming again that the equipment will perform as planned." The next day SK submitted its revised price quotation to Mapei. The revised price quotation's exclusivity provision (the 13-Arovac exclusivity provision) stated that "[i]f the first machine operates as specified in this order, Mapei agrees and is committed to purchase [13] subsequent machines" (i.e., the three Arovacs slated for delivery in February, plus ten subsequent machines delivered at a rate of two machines per quarter during 2008 and 2009).

Less than a week later, on May 21, Mapei asked SK to make a handful of changes, all technical in nature, to SK's revised price quotation. Three of the requested changes are on the same page on which the exclusivity provision is located. But Mapei did not request any change to that provision. On June 4, SK sent Mapei a second revised price quotation "per [Mapei's] comments" (the Price Quotation). The Price Quotation contained an exclusivity provision that, other than being limited to North America (the area covered by SK's Distributorship Agreement with Mapei), was in all material respects identical to the 13-Arovac exclusivity provision in the initial revised price quotation. A week after submitting the Price Quotation, SK inquired as to the status of a purchase order from Mapei and was advised that "the owner of the company . . . will review the CapEx and as soon as this is done, we will issue the [purchase order]."

---

[3] This was apparently a reference to Dr. Squinzi.

*4.  The CapEx Approval and Mapei-SK Purchase Order*

As the Price Quotation made its way through Mapei's CapEx process, Mapei noticed the quantities for several pieces of optional equipment to be included with the Arovac were wrong and notified SK.  SK agreed that the quantity for those pieces of equipment would need to change from one to two, and advised Mapei that the changes would increase the Arovac's total price by less than 2%, from €709,090 to €722,440.  With SK's agreement on the "exact optional equipment" and on "final pricing," CapEx was "fully approved" on June 21.  On June 22, Mapei issued a purchase order for one Arovac and two of each of the discussed pieces of optional equipment (the Mapei-SK Purchase Order).  The Mapei-SK Purchase Order was "based on" the Price Quotation, but was much shorter in length and omitted many of the provisions included in the Price Quotation, including the 13-Arovac exclusivity provision.  Similar to Mapei's letter of intent, the Mapei-SK Purchase Order for only one Arovac was not necessarily inconsistent with the Price Quotation's 13-Arovac exclusivity provision because that provision was contingent on the first Arovac working.

*5.  The Initial SK-Arodo Purchase Order*

After receiving the Mapei-SK Purchase Order, SK submitted its own purchase order to Arodo for the first Arovac on June 24.  Similar to the Price Quotation, SK's purchase order included a provision captioned "**Exclusivity**," which stated that, "[i]f the first machine operates as specified in this order, SK agrees to purchase [13] subsequent machines" and "Arodo will grant SK exclusivity [as distributor] . . . for Mapei's industry, specifically cement based tile adhesives," in North America.

*6.  The Order Confirmation and Mapei-SK Purchase Order Revision*

The following day, June 25, SK submitted an order confirmation to Mapei (the Order Confirmation).  The Order Confirmation listed the price of

No. 16-10430

the Arovac (with optional equipment) as €722,440, and included an exclusivity provision that was in all material respects the same as the 13-Arovac exclusivity provision in the Price Quotation.

Mapei issued a revised purchase order to SK to reflect an updated Euro conversion rate on June 26 and made the first of several payments to SK for the single prototype Arovac the next day.

7. *The Arovac Installation and Subsequent SK-Arodo Purchase Orders*

Over the succeeding months, the parties worked to finalize the design and delivery of the four phase-one Arovacs slated for delivery in December 2007 and February 2008. In November 2007, the parties conducted a test of the first Arovac at Arodo's Belgium plant, which was mostly successful, and the machine was shipped to Mapei. After the test, the parties agreed to delay delivery dates for the three other Arovacs (machine 2 was scheduled for delivery in April and machines 3 and 4 were scheduled for delivery in June) and agreed that Mapei would place a down payment for those machines by February 15. The parties also discussed, but failed to agree on, a request by Mapei for an expanded exclusive arrangement beyond cement-based tile adhesives.

The first Arovac was installed and accepted by Mapei in January 2008, and on February 11, SK sent Arodo a purchase order for the three remaining phase-one machines (together with the June 24 purchase order, the SK-Arodo Purchase Orders).[4] The February 11 purchase order contained an exclusivity provision similar to the one contained in the June 24 purchase order.

---

[4] Mapei made several revisions to the February 11 purchase order, the latest revision being March 28. We do not, however, separately address those revisions because neither party contends they are material to our analysis.

No. 16-10430

*8. Mapei's Requests to Delay Subsequent Machines*

Shortly thereafter, Mapei sought and obtained several extensions for down payment on the three remaining phase-one machines. The stated reason for the extensions was that Mapei had only ordered one Arovac and down payments or purchase orders for additional Arovacs could not be made or placed until a new contract was reached with the big-box retailer. Mapei sought and obtained the first extension from SK, but requested subsequent extensions directly from Arodo. At the same time, Mapei requested that Arodo establish an exclusive arrangement directly with it covering additional product segments beyond cement-based tile adhesives.

In May, SK, Arodo, and Mapei had a meeting, during which Mapei renewed its request for an expanded exclusive arrangement beyond cement-based tile adhesives. When the parties began to discuss the number of additional Arovacs that Mapei would need to commit to buy to obtain that exclusivity, the discussion quickly became very confrontational. SK took the position that any number less than 13 Arovacs over two years was a request to abandon an existing agreement on exclusivity for one with worse terms, while Mapei took the position that it had only issued a purchase order for a single Arovac and, thus, was not committed to purchase any additional Arovacs.

SK responded to the meeting with a May 29 letter from its attorney to Mapei proposing an "amendment to the [parties'] agreement under which Mapei would purchase a minimum of nine . . . additional machines over the next three . . . years" in exchange for an exclusive arrangement covering more than just cement-based tile adhesives. The letter also stated that it served as SK's last request for a down payment on machines two through four, which were in production. Two days later, on May 31, Mapei reiterated that it could not make any down payments or submit any additional purchase orders until

9

it had a written agreement with the big-box retailer it had lost several years ago, which it hoped to do soon.

Soon after, without any payment from Mapei, Arodo demanded that SK make a down payment on the three remaining phase-one Arovacs that were in production, which SK did.

### 9. *Mapei's Purchase of Subsequent Machines from Arodo*

On June 13, 2008, Mapei obtained a new contract with the big-box retailer that it had lost several years before. Three days later, on June 16, Mapei informed SK that, in view of the recent communications from SK and its attorney (which Mapei claims were threats by SK to sue it), it would limit subsequent communication to Arodo or through the parties' legal counsel. Later that same day, Mapei renewed its discussions with Arodo over an exclusive arrangement directly between them. A "key point" of that arrangement from Mapei's perspective was that Arodo reach an agreement with SK that "keeps [SK] away from Mapei" because Mapei had "no desire to interact with [SK]." After a July meeting between Mapei and Arodo, a business advisor working on behalf of Arodo (who attended the July meeting) informed SK that Mapei did not wish to work with SK anymore and that Arodo would deal directly with Mapei. The business advisor also informed SK that if the parties could not finalize the paperwork for a series of related agreements by September 1 that contained (among other things) a commitment that SK not sue Mapei in exchange for a commission on the Arovacs that Arodo sold to Mapei, his "suggestion [wa]s that Arodo and SK will go their 'own way.'"

SK refused to commit to such an agreement, but Arodo and SK did not immediately go their own way. The parties continued to work together under the Distributorship Agreement until Arodo was served with the present suit in March 2010, at which time Arodo informed SK that "cooperation between SK and Arodo is finished." However, after SK's refusal to reach an agreement with

No. 16-10430

Arodo on Mapei, Arodo and Mapei dealt directly with each other. In late 2008, Arodo sold the three remaining phase-one Arovacs to Mapei, and in February 2009, Arodo entered into a formal exclusivity agreement with Mapei (which covered product segments beyond cement-based tile adhesives). Later that year, Arodo formally recalled "any exclusivity" SK had been granted to sell Arovacs in North America. Arodo ultimately sold six additional Arovacs (nine total) directly to Mapei. SK did not receive any compensation from Arodo's direct sales to Mapei, other than Arodo returning to SK the down payment it placed for the three phase-one Arovacs.

## B. Procedural History

SK filed suit against Arodo and Mapei in Texas state court on January 21, 2010, asserting, *inter alia*, claims for breach of contract and tortious interference with an existing contract against both.[5] With respect to Mapei, SK alleged that it breached an agreement to purchase 14 Arovacs (reflected in the Price Quotation and Order Confirmation) and that it tortiously interfered with two related agreements SK had with Arodo: (1) the Distributorship Agreement and (2) an agreement established by the SK-Arodo Purchase Orders guaranteeing SK exclusivity in Mapei's industry (i.e., cement-based tile adhesives). SK's claims against Arodo largely mirrored its claims against Mapei. SK alleged a tortious interference claim against Arodo for its alleged interference with SK's contract with Mapei to purchase 14 Arovacs, as well as a claim for breach of two related agreements: (1) the Distributorship Agreement and (2) an agreement established by the SK-Arodo Purchase

---

[5] Among SK's other claims was one for fraud against Mapei. The district court granted Mapei's Rule 50(a) motion on that claim, and on appeal, SK "conditionally seeks a new trial" on that claim in the event this court affirms the district court's grant of a new trial. Because we reverse the district court's grant of a new trial, we do not address SK's fraud claim.

11

No. 16-10430

Orders guaranteeing SK exclusivity in Mapei's industry (i.e., cement-based tile adhesives).

Mapei removed the case to federal court on the basis of diversity jurisdiction, where Arodo moved to compel arbitration of SK's claims against it based on the broad arbitration agreement in the SK-Arodo Purchase Orders. The district court granted Arodo's motion and stayed further proceedings pending the resolution of SK's claims against Arodo in arbitration. The arbitration occurred before the International Chamber of Commerce in Paris on June 21, 2013. In the final award, the arbitrator found, *inter alia*, that Arodo did not breach the Distributorship Agreement by directly selling Arovacs to Mapei or commit an "abuse of right" by terminating that agreement in March 2010 precisely because the Distributorship Agreement was non-exclusive and of an indefinite duration. But the arbitrator did find that Arodo "severely breached" the exclusivity it granted to SK as distributor for Mapei's industry in the SK-Arodo Purchase Orders and did tortiously interfere with a "valid contract" between SK and Mapei to purchase 14 Arovacs by contracting directly with Mapei for subsequent Arovacs. The arbitrator also found SK was entitled to damages for both the breach and the tortious interference and awarded SK €491,634 in damages on its breach of contract claim, representing the lost profits on machines 2 through 4 (€533,535) less the deposit Arodo returned to SK on those machines (€41,901).[6] The arbitrator declined to award damages on machines 5 through 14 or for related service charges because SK had not proved "known added value" for them, as required to "receive compensation under Article 3 of the Belgian Law of 27 July 1961."

---

[6] The arbitrator did not separately award damages on SK's tortious interference claims (despite finding SK was entitled to damages) because these damages were included in the breach of contract award. The arbitrator did, however, separately award SK two thirds of the cost of arbitration and legal fees.

No. 16-10430

SK then moved in the district court to reopen the proceedings against Mapei and Arodo. After re-opening the case, the district court dismissed SK's remaining claims against Arodo under Federal Rule of Civil Procedure 54(b).[7] The district court thereafter denied SK and Mapei's competing motions for summary judgment on SK's claims against Mapei for breach of contract and tortious interference with an existing contract claim, and those claims proceeded to a jury trial. At the close of SK's case in chief, Mapei moved for judgment as a matter of law (JMOL) pursuant to Federal Rule of Civil Procedure 50(a) on both of those claims, which the district court denied. Following the week-long trial, the jury found that Mapei breached a contract with SK to purchase more than one Arovac and that Mapei tortiously interfered with SK's contractual relationship with Arodo. The jury awarded roughly $1.5 million to SK for breach of contract and roughly $6.1 million to SK for tortious interference (including over $2.7 million in punitive damages).

The district court requested post-verdict briefing, asking the parties to address whether there was "evidence indicating the owner of Mapei[8] gave his authorization to purchase more than one Arovac machine from [SK,] . . . along with everything else that you want to address." Mapei subsequently filed a renewed motion for JMOL under Federal Rule of Civil Procedure 50(b) on both SK's breach of contract and tortious interference with an existing contract claims, raising a number of different reasons why JMOL was appropriate, including an absence of evidence of authority by anyone to bind Mapei to contract to purchase more than one Arovac. Alternatively, Mapei moved for a new trial pursuant to Rule 59. In response, SK argued, *inter alia*, that Mapei waived the issue of lack of authority by not raising the issue in its Rule 50(a)

---

[7] SK did not appeal this dismissal, and it is not at issue in this appeal.

[8] The reference was apparently to Dr. Squinzi.

13

motion and that the jury's findings, in any event, had sufficient legal and factual support. After requesting and receiving additional briefing on whether SK was required to specifically plead apparent authority, the court granted Mapei's renewed JMOL motion, setting aside the jury verdict for those "reasons set forth in Mapei's [renewed JMOL motion], together with Mapei's post-verdict briefs." The district court also conditionally granted Mapei's request for a new trial "for the reason that the verdict of the jury on [SK's breach of contract and tortious interference claims] is against the great weight and preponderance of the evidence."

## II.  JUDGMENT AS A MATTER OF LAW

The district court granted JMOL on both SK's breach of contract and tortious interference with an existing contract claims. Because the reasons asserted in Mapei's renewed JMOL motion differed as to each claim, we address each one separately. But, first, we address the appropriate standard of review.

### A. Standard of Review

When a case is tried to a jury, a renewed motion for JMOL under Federal Rule of Civil Procedure 50(b) "is a challenge to the legal sufficiency of the evidence supporting the jury's verdict." *Cowart v. Erwin*, 837 F.3d 444, 450 (5th Cir. 2016) (quoting *Heck v. Triche*, 775 F.3d 265, 272 (5th Cir. 2014)). In reviewing a challenge to a jury verdict, "we draw all reasonable inferences and resolve all credibility determinations in the light most favorable to the [verdict]." *Id.* (quoting *Heck*, 775 F.3d at 273). The motion should be denied "unless there is no legally sufficient evidentiary basis for a reasonable jury to find as the jury did." *Id.* (quoting *Heck*, 775 F.3d at 273). We review the district court's ruling on a renewed motion for JMOL under Rule 50(b) de novo, applying the same standard in reviewing the motion as the district court. *Id.* Despite the de novo standard, our review is "especially deferential" to the jury's

verdict. *Brown v. Bryan County*, 219 F.3d 450, 456 (5th Cir. 2000) (citing *Snyder v. Trepagnier*, 142 F.3d 791, 795 (5th Cir. 1998)).

"However, '[c]hallenges to the sufficiency of the evidence must be raised in a Federal Rule of Civil Procedure 50(a) motion for judgment as a matter of law before submission of the case to the jury." *Seibert v. Jackson County*, 851 F.3d 430, 435 (5th Cir. 2017) (alteration in original) (quoting S*tover v. Hattiesburg Pub. Sch. Dist.*, 549 F.3d 985, 995 (5th Cir. 2008)). When an issue is not raised in a Rule 50(a) motion, our review of the jury's verdict is only for plain error because a party cannot "renew" a motion on an issue it never raised.[9] *See Flowers v. S. Reg'l Physician Servs. Inc.*, 247 F.3d 229, 238 (5th Cir. 2001). Factual sufficiency plain error review requires us to decide "whether there was any evidence to support the jury verdict." *Id.* (quoting *United States ex rel. Wallace v. Flintco Inc.*, 143 F.3d 955, 964 (5th Cir. 1998)). "If any evidence exists that supports the verdict, it will be upheld." *Id.*

**B. Breach of Contract**

On appeal, SK attacks each of the bases asserted in Mapei's renewed motion for JMOL on its breach of contract claim: (1) there was no meeting of the minds as to the purchase of more than one Arovac; (2) the exclusivity provision must be construed as a matter of law in Mapei's favor; and (3) no one with authority ever bound Mapei to purchase more than one Arovac. It also attacks the alternative basis for affirming raised by Mapei: SK's breach of contract claim is barred by Texas's one-satisfaction rule. We address each basis in turn.

---

[9] An exception to this rule applies when a non-movant fails, in the district court, to object to the new issue being raised in the Rule 50(b) motion; in that instance, the non-movant does not benefit from limited plain error review. *See Montano v. Orange County*, 842 F.3d 865, 877 (5th Cir. 2016).

No. 16-10430

### 1. Meeting of the Minds

Under Texas's codification of the Uniform Commercial Code (UCC), "[a] contract for [the] sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract."[10]  Tex. Bus. & Com. Code Ann. § 2.204.  The parties agree that they formed *a* contract for sale, but dispute whether that contract was for one Arovac or for 14 Arovacs.  The dispute largely hinges on what the "offer" and "acceptance" were for purposes of contract formation.  According to SK, the Price Quotation (which contained the 13-Arovac exclusivity provision) was the offer, which Mapei accepted via the Mapei-SK Purchase Order.  Mapei counters that the Price Quotation was not an offer because it contained what Mapei terms a "home office acceptance" clause, reserving the right of SK's headquarters to approve the Price Quotation.  In Mapei's view, the Mapei-SK Purchase Order was the offer, which SK accepted with the Order Confirmation.[11]

### a. The Offer

"An offer is an act that leads the offeree reasonably to believe that assent (i.e., acceptance) will conclude the deal." *Axelson, Inc. v. McEvoy–Willis*, 7 F.3d 1230, 1232–33 (5th Cir. 1993).  "Generally, a price quotation, such as one appearing in a brochure or on a flyer, is not considered an offer; rather, it is typically viewed as an invitation to offer." *J.D. Fields & Co. v. U.S. Steel Int'l, Inc.*, 426 F. App'x 271, 276 (5th Cir. 2011).  Despite this general rule, a price quotation can constitute an offer if, under the totality of the circumstances, it leads the recipient reasonably to believe that assent to the quotation is all that

---

[10] Texas law applies in this diversity action.

[11] Thus, according to Mapei, the 13-Arovac exclusivity provision in SK's Order Confirmation (to the extent it obligated Mapei to buy 13 additional Arovacs) differed materially from its Purchase Order and did not become part of the parties' contract. *See* Tex. Bus. & Com. Code Ann. § 2.207(b)(2).

is needed to ripen the quotation into a contract. *Id.* at 276–77; *see also, e.g.*, *Dyno Const. Co. v. McWane, Inc.*, 198 F.3d 567, 572 (6th Cir. 1999). Although that inquiry necessarily depends on the facts of the particular case, it often turns on the quotation's level of detail, the extent of prior inquiry, and the number of persons to whom the quotation was sent. *J.D. Fields*, 426 F. App'x at 280; *see also, e.g.*, *Nordyne v. Int'l Controls & Measurements Corp.*, 262 F.3d 843, 846 (8th Cir. 2001).

In this case, each of these factors weighs in favor of the jury's implied finding that the Price Quotation was an offer. First, the Price Quotation was highly detailed, totaling more than 50 pages and containing all the necessary elements for a contract. Second, the Price Quotation was not the initial substantive contact between the parties. Rather, as detailed *supra*, the Price Quotation followed numerous meetings and communications between the parties over the nearly ten-month period between August 2006 and June 2007, which resulted in two separate sets of revisions. Finally, the Price Quotation was not a generalized quote sent to a number of potential customers, "such as one appearing in a brochure or on a flyer." *J.D. Fields*, 426 F. App'x at 276. It was prepared and revised twice specifically for Mapei, at Mapei's request.

The home office acceptance clause in the Price Quotation's lengthy terms and conditions section—stating that "[a]ll quotations, orders and agreements made between [Mapei] and [SK]'s [agent] shall be subject to the acceptance and approval of [SK]'s headquarters"—certainly does undermine the jury's implied finding that the quotation was an offer.[12] *See id.* at 279 (recognizing a home office approval clause will prevent the formation of a contract when it is intended as a condition precedent to contract formation); *see also, e.g.*,

---

[12] SK's co-owner explained at trial that the provision was drafted by SK's attorney and mistakenly excludes the word "agent" after the first reference to SK.

*Nordyne*, 262 F.3d at 847.  But we cannot say, as Mapei urges, that it prevented the Price Quotation from constituting an offer as a matter of law.  *See Crest Ridge Constr. Grp., Inc. v. Newcourt Inc.*, 78 F.3d 146, 150 (5th Cir. 1996) (concluding that a clause in a price quotation stating it was subject to credit department approval did not prevent it from being an offer as a matter of law).  "[I]n light of the extensive dealings and preparations between these two parties, the jury could conclude this [home office approval] clause at most created a condition precedent on [SK]'s obligation to perform and did not prevent the formation of a contract." *Id.*  Indeed, the evidence showed that the Price Quotation was already approved by SK's "corporate headquarters"; it was prepared by SK's co-owner at, and sent directly from, SK's Texas headquarters. *See Nordyne*, 262 F.3d at 846.

While the parties' explanations of "industry custom . . . in this case are relevant to the issue of reasonableness, the UCC never informs that industry custom and course of dealing are alone determinative of the issue of contract formation." *J.D. Fields,* 426 F. App'x at 280 (emphasis omitted).  As such, we do not believe SK's testimony on industry practice—namely, that a purchase order must "kiss" an order confirmation to form a contract—means that the Price Quotation was not an offer as a matter of law.  *See id.*  Indeed, Mapei's own CapEx process, which requires all "contract specifics" to be submitted for approval, suggests that it viewed the Price Quotation as an offer.  Viewing the evidence in the light most favorable to the jury's verdict, there was legally sufficient evidence for the jury to impliedly conclude that the Price Quotation was an offer.

b. *The Acceptance*

Under the UCC, "[a] definite and seasonable expression of acceptance . . . operates as an acceptance even though it states terms . . . different from those offered." Tex. Bus. & Com. Code Ann. § 2.207(a).

18

No. 16-10430

Thus, unlike the "mirror image" rule at common law, the mere fact that a merchant's acceptance form contains materially different terms than the offer does not mean that it will be considered a rejection or counter-offer. *See, e.g.*, *JOM, Inc. v. Adell Plastics, Inc.,* 193 F.3d 47, 53 (1st Cir. 1999) (en banc) (per curiam). Rather, the form generally must provide unambiguous notice that it is a rejection or counter-offer. *See, e.g.*, *Gage Prods. Co. v. Henkel Corp.*, 393 F.3d 629, 642 (6th Cir. 2004).

Here, the Purchase Order unquestionably contained different terms from the Price Quotation: it omitted many of the provisions included in the Price Quotation, including the 13-Arovac exclusivity provision, and identified quantities of "2" instead of "1" for several optional items to be included with the Arovac.[13] Under one view of the facts, these differences, particularly the omission of the 13-Arovac exclusivity provision, suggest that Mapei's decision to send the Purchase Order for only one Arovac was an unambiguous rejection of the Price Quotation's offer. This view is bolstered by SK's May 7, 2007 email to Mapei indicating that Mapei's purchase order must include a "guarantee for subsequent machine[s]" for Mapei to obtain exclusivity. It finds further support in the fact that, if Mapei accepted the Price Quotation's 13-Arovac exclusivity provision (and SK's construction that it obligated Mapei to buy 13 Arovacs), Mapei would be required to make a substantial capital investment of nearly $14 million in Arovacs without any commitment from the big-box retailer, which it understandably would be hesitant to do.

Yet, an alternative view of the facts suggests that Mapei's Purchase Order did manifest acceptance of the Price Quotation, even though the terms of the two materially differed. As an initial matter, a purchase order for more

---

[13] Specifically, "Quick Removable Augers," a "Handle Former," and an "I-mark reader."

than one Arovac was neither "expect[ed]" nor would "make any sense" under the circumstances because the Price Quotation's exclusivity provision was contingent on the first Arovac working.  Moreover, SK's May 7, 2007 email to Mapei preceded Mapei's May 14, 2007 email indicating that, if SK wanted to specify the number of machines in the Price Quotation (that it submitted the following day), "th[e]n [SK] can put down 2/quarter, assuming again that the equipment will perform as planned."  Finally, despite the substantial capital investment required by SK's construction of the 13-Arovac exclusivity provision, a reasonable jury could have concluded that such an investment was necessary on Mapei's part to prevent its competitors from obtaining the Arovac and, thereby, potentially securing a competitive advantage in the marketplace. Viewing the evidence in the light most favorable to the jury's verdict, we cannot conclude there is no legally sufficient evidentiary basis for the jury's implied acceptance of this latter view.

### 2. Contract Construction

Mapei argued in its renewed motion for JMOL that, even if the Price Quotation was an offer and its Purchase Order the acceptance, the Price Quotation's exclusivity provision did not, in fact, require Mapei to purchase 13 additional Arovacs.  Rather, it simply provided that, in order to obtain exclusivity, Mapei had to buy 13 additional Arovacs.[14]  Accordingly, Mapei asked the district court to construe the provision as a matter of law in its favor.

---

[14] It is not entirely clear whether, under Mapei's proposed construction, exclusivity would (1) first attach when all 14 Arovacs were purchased or (2) end when Mapei stopped purchasing Arovacs according to the contemplated schedule.  Because the first construction would not make commercial sense—it would require Mapei to forfeit any potential edge and risk serious exposure by having to wait two years before obtaining exclusivity—we presume it intended the latter construction, despite contrary testimony from at least one of its employees.

No. 16-10430

The Price Quotation's exclusivity provision states in plain terms that, "[i]f the first machine operates as specified in this order, Mapei agrees and is committed to purchase [13] subsequent machines" and "SK will grant Mapei exclusivity to the Arovac . . . for its industry." The fact that this statement appears under the heading of "**Exclusivity**" does not compel construction in Mapei's favor, as it urges. The heading merely reflects that the promise by Mapei to purchase 13 Arovacs and the promise by SK to grant exclusivity are reciprocal. It does not, however, indicate whether they are independent promises (i.e., Mapei must buy 13 Arovacs and SK must grant exclusivity, regardless of whether the other performs) or are dependent promises (i.e., SK must grant exclusivity so long as Mapei continues to buy 13 Arovacs over the specified two-year period). The fact that the only conditional language in the 13-Arovac exclusivity provision relates to the first Arovac operating as specified suggests that the former construction is the correct one. Indeed, in its motion for summary judgment and in its Rule 50(a) motion, Mapei effectively conceded as much, arguing that the virtually identical exclusivity clause in SK's Order Confirmation transformed Mapei's purchase order for one machine into a commitment to purchase 14 machines and, thus, increased the price of Mapei's order by approximately $13 million. Accordingly, Mapei's request to now construe the Price Quotation's 13-Arovac exclusivity provision in its favor must be rejected. *See, e.g., In re Isbell Records, Inc.*, 774 F.3d 859, 868–69 (5th Cir. 2014) (refusing to set aside jury verdict based on argument raised in Rule 50(b) motion that was previously disclaimed in connection with Rule 50(a) motion).

### 3. *Authority*

After the jury returned its verdict, the district court requested post-verdict briefing on whether evidence proved Dr. Squinzi, the chief executive officer, chairman, and majority shareholder of Mapei's parent company,

21

authorized the purchase of more than one Arovac.  In response, Mapei filed a renewed motion for JMOL, raising this lack-of-authority argument for the first time.  Mapei did argue in its initial motion for JMOL (and its motion for summary judgment, which it purported to incorporate by reference) that there was not a "meeting of the minds" as to more than one Arovac, but critically never raised the distinct issue of authority.[15]  *See, e.g.*, *Anland N., L.P. v. Ctr. Operating Co.*, No. 05–12–00128–CV, 2012 WL 2045371, at *3 (Tex. App.—Dallas June 7, 2012, no pet.) (mem. op., not designated for publication) (analyzing issue of authority separate from existence of a meeting of minds).  In fact, the word "authority" only appears once in either Mapei's initial motion for JMOL or motion for summary judgment—in a footnote.  Because SK objected to the lack-of-authority issue not being raised in Mapei's Rule 50(a) motion, our review is under the plain error standard discussed *supra*, which requires us to affirm the jury's implied finding of authority if there is any evidence that supports it.

In Texas, the authority to manage the affairs of a corporation, like Mapei, is vested in its board of directors, and the authority of its officers and agents to contract on its behalf "must be found either in specific statutes, in the organic law of the corporation, or in a delegation of authority from the board of directors." *Agri Exp. Coop. v. Universal Sav. Ass'n*, 767 F. Supp. 824, 829 (S.D. Tex. 1991), *corrected*, 780 F. Supp. 1466 (S.D. Tex. 1991) (citing *Templeton v. Nocona Hills Owners Ass'n*, 555 S.W.2d 534, 537 (Tex. Civ. App.—Texarkana 1977, no writ)).  Yet even when an officer or agent's actual authority is lacking, "apparent authority may arise by a princip[al]'s action which lacks

---

[15] An absence of authority and an absence of a meeting of the minds are related but distinct elements of contract formation.  Thus, a lack of a meeting of a minds is fatal to the formation of any contract, even a contract into which an employee might have had authority to enter.  Conversely, a meeting of the minds does not form a contract when the employee is not authorized to enter into the agreement.

such ordinary care as to clothe an agent with the indicia of authority, thus leading a reasonably prudent person to believe that the agent has the authority he purports to exercise." *Id.* at 830; *see also NationsBank, N.A. v. Dilling*, 922 S.W.2d 950, 952–53 (Tex. 1996) (per curiam). Thus, "[a]pparent authority is not available where the other contracting party has notice of the limitations of the agent's power." *Humble Nat'l Bank v. DCV, Inc.*, 933 S.W.2d 224, 238 (Tex. App.—Houston [14th Dist.] 1996, writ denied).

Here, the evidence clearly demonstrates several things: (1) the Mapei employees with whom SK communicated were delegated authority by Mapei's board to conduct preliminary negotiations on large purchases in preparation for submission through Mapei's internal CapEx process; (2) the delegation of authority to those employees was limited to preliminary negotiations—they could not commit Mapei to make capital expenditures of more than €10,000 without obtaining approval from its board and Dr. Squinzi; (3) Mapei and SK's employees knew about that limitation on those employees' authority; and (4) Mapei's board and Dr. Squinzi approved the CapEx submitted in connection with the Price Quotation. Thus, the principal question we must answer is whether there is any evidence to demonstrate the CapEx submitted was for the purchase of 14 Arovacs, rather than one Arovac.

The evidence presented at trial on the issue was thin. The record does not contain the form by which the CapEx was approved; the contents of that form or the materials attached to it, other than the Price Quotation; or testimony or minutes reflecting exactly what Mapei's board or Dr. Squinzi understood was being submitted for approval. Emails and testimony from Mapei's employees indicating that Mapei's board would not approve subsequent purchase orders without a contract from the big-box retailer are certainly probative that the board and Dr. Squinzi only approved the purchase of one Arovac. (The CapEx was approved *before* Mapei obtained the new

contract with the big-box retailer.)  So is the fact that Mapei issued a purchase order for only one Arovac, especially in the face of SK's request that Mapei's "guarantee for subsequent machine[s]" be included in the purchase order.

Yet, viewing the evidence in the light most favorable to the jury's verdict as we must, we cannot say that there is no evidence that Mapei's board and Dr. Squinzi approved the purchase of 14 Arovacs.  An exclusive arrangement with SK was admittedly critical to Mapei's efforts to win back its lost contract and it was reasonably understood that, in order to obtain such an arrangement, Mapei would ultimately be required to buy more than one Arovac from SK. Moreover, the conduct of the employees principally tasked with submitting the CapEx is consistent with Mapei committing to purchase more than one Arovac (e.g., discussing delivery dates, discounts, and product designs for subsequent machines with SK before any purchase order was approved for those machines).  Finally, the fact that the Mapei-SK Purchase Order related to only a single Arovac was not necessarily inconsistent with the purchase of 14 Arovacs because the purchase of the remaining 13 was contingent on the first one working.  Given the plain error standard of review, which considers whether there is any evidence to support the jury's implied finding of authority, the jury's verdict must be respected.

### 4. Texas's One–Satisfaction Rule

As an alternative basis for affirming, Mapei asserts that SK is barred from recovering on its breach of contract claim against Mapei because SK has already recovered from Arodo for claims that Arodo interfered with the same alleged contract.[16]  According to Mapei, at arbitration, the arbitrator found

---

[16] In its renewed motion for JMOL, Mapei raised the one-satisfaction rule, but only as to SK's tortious interference claim.  Mapei did, however, previously raise the one-satisfaction rule as to SK's breach of contract in its motion for summary (which it purported to incorporate into its Rule 50(a) motion).  Because Mapei's argument is meritless, we need not parse whether de novo or plain error review is more appropriate under this circumstance.

No. 16-10430

that Arodo tortiously interfered with SK's contract with Mapei and, consistent with Texas law, awarded SK damages equal to the benefit of its alleged bargain with Mapei—its lost profits.  Because SK already recovered its lost profits from Arodo on this contract, Mapei asserts the one-satisfaction rule precludes SK from recovering more lost profits from it.

In the arbitration, SK did recover damages from Arodo, but these damages only related to Mapei's purchase of machines 2 through 4 on account of intricacies in Belgian damages law that Mapei does not expound upon in its briefing. In this case, governed by Texas law, the jury apparently heeded Mapei's repeated assertions that SK had already been compensated for machines 2 through 4 and awarded damages for only machines 5 through 14; its award was for an amount less than requested by SK and in line with the profits SK could have reasonably stood to gain from only machines 5 through 14.  Thus, there is no double-recovery in this case or, consequently, any role for the one-satisfaction rule.  *See, e.g.*, *Coastal Agric. Supply, Inc. v. JP Morgan Chase Bank, N.A.*, 759 F.3d 498, 511–12 & n.82 (5th Cir. 2014) (recognizing the one-satisfaction rule provides an offset to damages to prevent a double recovery); *Mobil Chem. Co. v. Blount Bros. Corp.*, 809 F.2d 1175, 1180 n.4 (5th Cir. 1987) (same); *see also, e.g.*, *Oyster Creek Fin. Corp. v. Richwood Invs. II, Inc.*, 176 S.W.3d 307, 328 (Tex. App.—Houston [1st Dist.] 2004, pet. denied).

*5. Conclusion*

The jury was presented with two alternative, but plausible, accounts of the formation and authorization of a contract.  The jury reasonably selected one of those alternatives.  Therefore, we discern no basis for setting aside the jury's verdict on SK's breach of contract claim.

**C. Tortious Interference**

As discussed *supra*, SK alleged that its contractual relationship with Arodo had two components: (1) an exclusive distributorship for SK to sell to

Mapei pursuant to the SK-Arodo Purchase Orders and (2) a non-exclusive distributorship for SK to sell to North American customers pursuant to the Distributorship Agreement.  In its renewed motion for JMOL, Mapei asserted that SK had provided legally insufficient evidence to demonstrate that Mapei's alleged interference caused SK any damages.  Specifically, Mapei argued that SK had failed to provide anything beyond unsupported speculation that it would have sold more than the 14 Arovacs which it contracted with Mapei to resell through its contractual relationship with Arodo.  Therefore, Mapei argued, SK was limited to its breach of contract recovery (i.e., the profits it would have earned from buying the 14 Arovacs from Arodo and reselling them to Mapei at a marked-up price).  On this point, we agree with Mapei.[17]

SK was not guaranteed any profit from its contractual relationship with Arodo.  Under that relationship, SK was merely entitled to buy Arovacs from Arodo and resell them at a marked-up price to third-parties, like Mapei.  Thus, the only potential damages SK suffered from Mapei's interference with its contractual relationship with Arodo were lost profits it would have derived from sales to third-parties.  SK produced two experts at trial to quantify the value of the lost profits it suffered.  The first expert, an accountant, testified to the profits SK would have earned from its sale of the 14 Arovacs to Mapei (i.e., the damage SK suffered from Mapei's breach of contract).  The second expert, an economist, testified to lost profits SK would have earned from sales to other companies (i.e., the damage SK suffered from Mapei's alleged tortious interference).  Mapei challenges this second expert's testimony—the principal,

---

[17] Therefore, we do not address the remaining bases asserted by Mapei for granting JMOL on SK's tortious interference claim: (1) collateral estoppel precludes SK from re-litigating its damages arising from its relationship with Arodo, which were fully litigated in the SK-Arodo arbitration; (2) Texas's one-satisfaction rule precludes recovery beyond that awarded in the SK-Arodo arbitration; and (3) the Distributorship Agreement with Arodo is not an enforceable contract under Texas law.

if not sole, basis for the jury's lost profits award on SK's tortious interference claim—as nothing more than unsupported speculation.

For a plaintiff to recover lost profits, there must a causal relationship between the amount of lost profits suffered by the plaintiff and the defendant's actions. *See Homoki v. Conversion Servs., Inc.*, 717 F.3d 388, 398 (5th Cir. 2013). Although the amount of lost profits need not be susceptible to exact calculation, the plaintiff "must do more than show that they suffered some lost profits." *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992); *see also Szcepanik v. First S. Trust Co.*, 883 S.W.2d 648, 650 (Tex. 1994). The plaintiff must prove the amount of lost profits "by competent evidence with reasonable certainty." *Szcepanik*, 883 S.W.2d at 649*; see also Phillips v. Carlton Energy Grp., LLC*, 475 S.W.3d 265, 278–79 (Tex. 2015). As a minimum, this requires the amount of lost profits to be based on objective facts, figures, or data and be predicated on one complete calculation. *Holt Atherton Indus.*, 835 S.W.2d at 84–85; *see also Phillips*, 475 S.W.3d at 278–79. When a plaintiff's lost profits are dependent on its lost contracts with customers, both the existence and the number of such contracts must be proved with reasonable certainty. *Great Pines Water Co. v. Liqui-Box Corp.*, 203 F.3d 920, 922–23 (5th Cir. 2000). "[T]he bare assertion that contracts were lost does not demonstrate a reasonably certain objective determination of lost profits." *Holt Atherton Indus.,* 835 S.W.2d at 85.

Here, SK's economic expert estimated SK's lost profits from future sales by, first, taking the (largely unchallenged) incremental profit from an Arovac sale calculated by SK's accounting expert, second, multiplying that incremental profit by the number of Arovacs that he estimated SK would have sold per year but for Mapei's alleged interference, and, finally, applying a discount rate to the resulting annual incremental profit to account for market risks that might preclude that amount of profit from being realized. With

respect to the second step, SK's economic expert estimated that SK would sell seven machines per year. That estimate, however, was based on nothing more than speculation. It was not supported by any empirical analysis or any evidence outside of the tripartite relationship between SK, Arodo, and Mapei (e.g., real-world sales, customer surveys, or current market demand).

As justification for his estimate, SK's economic expert cited SK's contract with Mapei to purchase 14 machines over two years and emails between Mapei and Arodo dickering over exclusivity, in which Mapei indicates Arodo could "sell dozens of [Arovacs] in [certain product segments] with adequate representation and technical support." But neither piece of evidence takes the expert's estimate of seven machines per year out of the realm of mere speculation. Beyond the obvious fact that the existence of the SK-Mapei contract was bitterly contested, the contract was clearly the result of Mapei's unique demand in 2006 and 2007, which was created by Mapei's efforts to obtain a new contract with the big-box retailer. Thus, the SK-Mapei contract does not provide any evidence that SK would have obtained similar contracts in the future (let alone that SK did not obtain those contracts on account of Mapei's alleged interference). *See McBeth v. Carpenter*, 565 F.3d 171, 176–77 (5th Cir. 2009) (concluding evidence that a "later transaction" was profitable was not evidence of lost profits due to defendants' actions because the later transaction was "markedly different" from the transaction at issue). This conclusion is reinforced by the fact that the Distributorship Agreement was terminable at will. *See Blase Indus. Corp. v. Anorad Corp.*, 442 F.3d 235, 238 (5th Cir. 2006) (concluding future lost profit estimate from at-will arrangement was too speculative to support damages); *see also Mood v. Kronos Prods. Inc.,* 245 S.W.3d 8, 13 (Tex. App.—Dallas 2007, pet. denied) (concluding expert's damages model was no evidence of lost profits because it assumed the continuance of a distributorship agreement). Similarly, Mapei and Arodo's

unsubstantiated, self-serving speculations about future sales are "legally insufficient to show lost profits." *Szcepanik*, 883 S.W.2d at 650; *see also SportsBrand Network Recovery Fund, Inc. v. PGA Tour, Inc.*, 136 F.3d 1329, 1998 WL 44564, at \*11–12 (5th Cir. 1998) (unpublished) (concluding parties' projections were too speculative to serve as a basis for lost profits claim). Accordingly, the economic expert's testimony did not furnish a legally sufficient evidentiary basis for the jury to award lost profits beyond those SK would have earned under its contract with Mapei.[18]   *See Genmoora Corp. v. Moore Bus. Forms, Inc.*, 939 F.2d 1149, 1157 (5th Cir. 1991), *on reh'g* (Sept. 30, 1991); *see also Great Pines Water Co.,* 203 F.3d at 923–24.

SK nonetheless asserts that the jury's award of lost profits beyond those it would have earned under its contract with Mapei should stand because the evidence at trial showed a company inquired in 2009 about a potential purchase of Arovacs.  Although this inquiry may be some evidence of demand for the Arovac, it is no evidence of lost profits SK suffered from Mapei's breach or alleged interference.  According to the testimony of one of SK's co-owners, the inquiring company was a direct competitor of Mapei's and, therefore, covered under the exclusivity provision in SK's contract with Mapei.  Thus, the 2009 inquiry could not have yielded a contract even in the absence of Mapei's breach or alleged interference.[19]   The 2009 inquiry then cannot constitute reasonably certain evidence of SK's lost profits in this case.

---

[18]  Indeed, the objective sales data we could locate in the record suggests that Arodo has only sold 12 fully operational Arovacs *ever*.  The two Arovacs that were not sold to Mapei were also apparently sold by SK, so there is no lost profits attributable to them.  Both of those purchasers, however, appear to have had a dispute with SK and no longer buy from SK.

[19] Although SK's other co-owner seemed to testify that SK could have sold to the company after 2009—when he asserted exclusivity ended—there is nothing in the plain language of the exclusivity clause that supports termination of the exclusivity granted to Mapei at the end of 2009.  SK, just like Mapei, is bound by the construction of the exclusivity provision outlined *supra*.

No. 16-10430

With legally insufficient evidence to support an award of damages beyond those that SK suffered as a result of Mapei's breach of contract, we affirm the district court's decision to grant JMOL on SK's claim for tortious interference with an existing contract and its related claim for punitive damages.[20] *See Bellefonte Underwriters Ins. v. Brown,* 704 S.W.2d 742, 745 (Tex. 1986) (holding that punitive damages are unavailable in the absence of a showing of actual tort damages).

### III.  CONDITIONAL GRANT OF NEW TRIAL

In light of our conclusion that the district court erred in granting JMOL on SK's breach of contract claim, we must address the district court's conditional grant of a new trial with respect to that claim.  The district court conditionally granted a new trial because "the verdict of the jury on [SK's breach of contract claim] is against the weight and preponderance of the evidence."  We review a district court's decision on a motion for new trial for abuse of discretion.  *Laxton v. Gap Inc.,* 333 F.3d 572, 586 (5th Cir. 2003).  However, we accord less deference to a decision to grant a new trial than one to deny a new trial, *id.,* exercising "particularly close scrutiny" of a district court's grant of a new trial on evidentiary grounds in order "to protect the litigants' right to a jury trial," *Shows v. Jamison Bedding, Inc.,* 671 F.2d 927, 930 (5th Cir. 1982).  The standard for granting a new trial is less stringent than the standard for granting JMOL, *see Keeler v. Richards Mfg. Co.,* 817 F.2d

---

[20] Neither in the district nor on appeal has SK asserted that, in the absence of damages beyond those compensated by its contract claim, it would be entitled to elect judgment on its tortious interference claim as the most favorable theory of recovery, thereby permitting a recovery of punitive damages. *See Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 304 (Tex. 2006) (discussing election-of-remedies doctrine). Accordingly, SK has waived that issue. *See, e.g.*, *Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 339 (5th Cir. 2005). Regardless, based on our extensive review of the record, we must conclude that SK has failed to provide legally sufficient evidence to support the jury's award of punitive damages. Accordingly, the result would, in any event, be the same if SK were entitled to make such an election.

1197, 1200 (5th Cir. 1987), but a new trial "should not be granted on evidentiary grounds 'unless, at a minimum, the verdict is against the great—not merely the greater—weight of the evidence,'" *Shows*, 671 F.2d at 930 (quoting *Conway v. Chem. Leaman Tank Lines, Inc.*, 610 F.2d 360, 363 (5th Cir. 1980) (per curiam)).

Here, as detailed *supra*, the jury was presented with two relatively uncomplicated, but conflicting, theories of contract formation and authorization and resolved the conflicting testimony without any obvious prejudicial influences. Accordingly, despite presenting a very close case (particularly with respect to the issue of authority), we conclude that the jury's award on SK's breach of contract claim was not against the great weight of the evidence and that the district court abused its discretion in granting a new trial. *See id.*

## IV. CONCLUSION

For the foregoing reasons, we REVERSE the district court's grant of JMOL on SK's breach of contract claim and its conditional grant of a new trial and AFFIRM the district court's grant of JMOL on SK's claim for tortious interference with an existing contract and related claim for punitive damages. We REMAND to the district court for entry of judgment consistent herewith and for the calculation and award of attorneys' fees and pre-judgment and post-judgment interest in connection with the contract claim.[21] Each party shall bear its own costs.

---

[21] SK moved for pre-judgment and post-judgment interest in the district court, but the district court did not consider that motion, concluding the motion was moot in light of its decision to set aside the jury's verdict and enter a take nothing judgment. Although SK has requested that this court decide whether and what amount of pre-judgment and post-judgment interest is appropriate, "[i]t is the general rule . . . that a federal appellate court does not consider an issue not passed upon below." *Humphries v. Elliott Co.*, 760 F.3d 414, 418 (5th Cir. 2014) (quoting *Singleton v. Wulff*, 428 U.S. 106, 120 (1976)). Given the parties' dispute over at least the proper pre-judgment period, we are convinced that the normal course

---

should be followed in this case. *See Alexander v. Hartford Life & Accident Ins. Co.*, 347 F. App'x 123, 126 (5th Cir. 2009) (per curiam) (remanding case for district court to determine entitlement to pre-judgment interest); *see also Concorde Limousines, Inc. v. Moloney Coachbuilders, Inc.*, 835 F.2d 541, 549 (5th Cir. 1987) (remanding case to district court for an explanation of the circumstances that warranted denial of pre-judgment interest). Accordingly, we remand the case to the district court for "a determination of whether . . . interest is appropriate and, if so, at what rate and for what periods," without expressing a "view as to the outcome of this further inquiry." *In re Redondo Constr. Corp.*, 678 F.3d 115, 126 (1st Cir. 2012).